Daniel BERG and Sheryl Berg,
H/W, Appellants

v.

NATIONWIDE MUTUAL INSURANCE
COMPANY, INC., Appellee.

Superior Court of Pennsylvania.

Argued Oct. 25, 2012.

Filed April 17, 2012.

Reargument Denied June 29, 2012.

Benjamin J. Mayerson, Pottstown, for appellants.

Micheal R. Nelson, Blue Bell, for appellee.

BEFORE: DONOHUE, OLSON and STRASSBURGER*, JJ.

## OPINION BY DONOHUE, J.:

Appellants, Daniel and Sheryl Berg (collectively, the "Bergs"), appeal from the entry of judgment after the trial court granted Appellee Nationwide Mutual Insurance Company, Inc.'s ("Nationwide") motion for a directed verdict on the Bergs' claims under Pennsylvania's bad faith insurance statute, 42 Pa.C.S.A. § 8371. For the reasons set forth herein, we vacate the judgment and remand the case for a new trial.

On September 4, 1996, the Bergs' 1996 Jeep Grand Cherokee was involved in an accident and sustained extensive damage. On the date of the accident, the Bergs were insured by a Nationwide automobile policy that covered, *inter alia*, losses "caused by collision or upset." The Bergs elected to take the Jeep to Lindgren Chrysler–Plymouth, Inc. ("Lindgren"), a participating repair facility in Nationwide's "Blue Ribbon Repair Service Program" ("BRRP"). The BRRP is Nationwide's direct repair program, pursuant to which claimants may take their vehicles to a designated "Blue Ribbon" repair facility for appraisal and repair. The BRRP is an option to the more traditional method of claims processing, where the claimant obtains an appraisal from a third-party repair shop to institute the repair process. On or about December 30, 1996, after approximately four months of repairs, the Bergs' vehicle was finally returned to them.

According to the Bergs, in October 1997 they received a telephone call from David Wert, a former employee of Lindgren, who advised them of possible structural repair failures to their Jeep. On January 23, 1998, the Bergs commenced the present action through the filing of a writ of summons against Lindgren and Nationwide. After pre-trial discovery, on May 4, 1998 the Bergs filed their initial complaint, and after a series of preliminary objections, the Bergs' final amended complaint (the eighth) was filed on October 25, 1998. It asserted causes of action against Lindgren for breach of contract, negligence, breach of warranty, common law fraud, conspiracy, and violation of the catchall provision of the Uniform Trade Practices and Consumer Protection Law, 73 P.S. § 201–2(4)(xxi) ("UTPCPL").[1] It asserted claims against

---

* Retired Senior Judge assigned to the Superior Court.

1. (4) 'Unfair methods of competition' and 'unfair or deceptive acts or practices' mean any one or more of the following:

 * * *

 (xxi) Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

73 P.S. § 201–2(4)(xxi).

Nationwide for breach of contract, negligence, common law fraud, conspiracy, violation of the UTPCPL, and for insurance bad faith, 42 Pa.C.S.A. § 8371.

The trial court bifurcated the trial, with the first phase consisting of a jury trial on the Bergs' claims for common law fraud, conspiracy, and liability under the UTPCPL, and the second phase a bench trial on the issues of treble damages under the UTPCPL and for claims pursuant to the insurance bad faith statute. The first phase began on December 13, 2004, and after five days of trial, the jury returned a verdict finding that both Lindgren and Nationwide had violated the catchall provision of the UTPCPL, and in favor of Lindgren and Nationwide on the common law fraud and conspiracy claims. The jury awarded compensatory damages of $1,925 against Lindgren and $295 against Nationwide.

Lindgren and Nationwide both filed motions for post-trial relief, arguing that the jury's verdict was inconsistent. In their arguments, Lindgren and Nationwide relied on *Booze v. Allstate*, 750 A.2d 877, 880 (Pa.Super.2000), for the proposition that liability under the catchall provision of the UTPCPL required a finding of common law fraud as a prerequisite to liability under the statute.[2] According to Lindgren and Nationwide, the jury's decision in their

favor on the common law fraud claim necessitated a similar verdict on the UTPCPL claim as well. In a written opinion, the trial court disagreed for two reasons. First, the trial court ruled that Lindgren and Nationwide had waived this argument when they declined the trial court's offer to have the jurors questioned regarding the possible inconsistency in their verdict. Trial Court Opinion, 4/7/05, at 10. Second, detailing Pennsylvania's strong presumption of the consistency of verdicts, the trial court concluded that the jury could have decided, "that it would be more appropriate to find that Nationwide and Lindgren engaged in fraudulent or deceptive conduct in a consumer or business transaction which created a likelihood of confusion or misunderstanding, rather than simply common law fraud."[3] *Id.* at 9.

The phase two trial began on June 5, 2007, and after four days of testimony, Nationwide moved for a directed verdict. On July 10, 2007, after the submission of briefs and oral argument, the trial court granted Nationwide's motion for directed verdict on the Bergs' claims under the insurance bad faith statute (42 Pa.C.S.A. § 8371).[4] On October 29, 2007, the trial court denied the Bergs' motion for post-trial relief, and after entry of judgment on December 7, 2007, the Bergs filed a timely notice of appeal.[5]

---

**2.** This Court recently held to the contrary. *Bennett v. A.T. Masterpiece Homes at Broadsprings, LLC*, 40 A.3d 145, 155, 156 (Pa.Super.2012) ("[C]atchall provision liability [under the UTPCPL] can arise when the plaintiff alleges either fraudulent *or* deceptive conduct.") (emphasis in original).

**3.** Prior to the trial court's decision, Lindgren paid the compensatory damages assessed by the jury and was dismissed from the case. Lindgren thus was not a participant in the phase two trial and is not a party to this appeal.

**4.** The trial court entered a separate order granting a verdict against the Bergs on their claim for treble damages under the UTPCPL. The Bergs have not challenged this ruling and thus, the treble damages issue is not before this Court. Similarly, neither party has appealed any aspect of the jury verdicts in the phase one portion of the trial.

**5.** On January 3, 2008, the trial court issued an order directing counsel to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). On March 14, 2008, the trial court filed a "Statement in Lieu of Memorandum Opinion," in which it

The Bergs raise five issues for our consideration and determination:

1. Was it reversible error to grant a directed verdict on the issue of statutory bad faith, after the jury found the insurer's conduct violated the catchall provision under the UTPCPL in the first phase of the trial.

2. Was it reversible error to rule that this lawsuit, stemming from a first party collision claim, was not 'an action arising under an insurance policy,' simply because the insured[s] agreed to have their collision damage appraised and repaired by the insurer's collision repair program which the insurer does not identify in the policy of insurance.

3. Was it reversible error to preclude evidence, in a non-jury phase of a bifurcated trial, when that evidence was relevant to prove the insurer implemented its secret, but well documented strategy to deter contingency-fee lawyers from representing claimants with small value claims by making the litigation too expensive. Specifically, did the trial court abuse its discretion when it precluded from evidence, during the non-jury trial phase, the $922,654.25 that the insurer paid its attorneys to defend this lawsuit over a failed collision claim.

4. Was it reversible error to find the insured[s] waived their right to obtain discoverable claim file entries improperly redacted pursuant to a false assertion of attorney-client privilege, where an Order of record required the insurer to produce all claim file materials protected by attorney-client privilege, and where a second Order was entered after the insured filed a motion for sanctions, and, notwithstanding the two Orders, the insurer nevertheless continued to conceal the evidence via a false assertion of privilege.

5. Was it reversible error to permit the insurer to use the attorney-client privilege as a shield and sword. Specifically, was it reversible error to permit the insurer to conceal numerous claim file entries pursuant to an asserted attorney-client privilege, and then to also permit the insurer to offer the same claim file as evidence to prove it had no knowledge of repair issues inasmuch as there was no reference to repair issues in the redacted claim file.

Bergs' Brief at 5–6.

For their first two issues on appeal, the Bergs contend that the trial court's two reasons for entering a directed verdict in favor of Nationwide were in error. In its Pa.R.A.P. Rule 1925(a) opinion, the trial court indicated that it entered a directed verdict because: (1) the BRRP "is not a part of Nationwide's automobile insurance policy" and thus Pennsylvania's bad faith insurance statute does not apply in this case, and (2) the case of *Romano v. Nationwide Mut. Fire Ins. Co.*, 435 Pa.Super. 545, 646 A.2d 1228 (1994), does not apply in this case and thus the jury's verdict against Nationwide for a violation of the catchall provision of the UTPCPL does not require a finding of bad faith against Na-

stated that it had not received a copy of the Bergs' Rule 1925(b) concise statement and that, as a result, all issues were waived and the appeal should be quashed. The Bergs then filed a petition to modify the record, claiming that the prothonotary had thwarted personal service on the trial court. Litigation over this issue ensued, resulting in final resolution in the Bergs' favor *via* a decision by our Supreme Court in *Berg v. Nationwide Mut. Inc. Co., Inc.*, 607 Pa. 341, 6 A.3d 1002 (2010).

tionwide. Trial Court Opinion, 6/3/11, at 5, 9. For the reasons set forth here, we conclude that the trial court erred in both of these respects.

We begin with our standards of review. In reviewing the trial court's entry of a motion for a directed verdict, "our scope of review is limited to determining whether the trial court abused its discretion or committed an error of law that controlled the outcome of the case." *Fetherolf v. Torosian,* 759 A.2d 391, 393 (Pa.Super.2000). "A directed verdict may be granted only where the facts are clear and there is no room for doubt." *Id.* (quoting *Lear, Inc. v. Eddy,* 749 A.2d 971, 973 (Pa.Super.2000)). "In deciding whether to grant a motion for a directed verdict, the trial court must consider the facts in the light most favorable to the nonmoving party and must accept as true all evidence which supports that party's contention and reject all adverse testimony." *Id.*

On the other hand, *the interpretation of an insurance policy is a question of law for this Court to resolve.* *Travelers Casualty & Surety Company v. Castegnaro,* 565 Pa. 246, 251, 772 A.2d 456, 459 (2001). Our standard of review, therefore, is plenary. *Continental Cas. Co. v. Pro Machine,* 916 A.2d 1111, 1118 (Pa.Super.2007). In interpreting the language of an insurance policy, the goal is "to ascertain the intent of the parties as manifested by the language of the written instrument." *Kane v. State Farm Fire and Casualty Co.,* 841 A.2d 1038, 1042 (Pa.Super.2003) (citation omitted). Our Supreme Court has instructed that the "polestar of our inquiry ... is the language of the insurance policy." *Madison Const. Co. v. Harleysville Mut. Ins. Co.,* 557 Pa. 595, 606, 735 A.2d 100, 106 (1999).

Our Supreme Court has long recognized that "the utmost fair dealing should characterize the transactions between an insurance company and the insured." *Dercoli v. Pennsylvania Nat. Mut. Ins. Co.,* 520 Pa. 471, 477, 554 A.2d 906, 909 (1989) (quoting *Fedas v. Insurance Company of the State of Pennsylvania,* 300 Pa. 555, 559, 151 A. 285, 286 (1930)). Moreover, the insurance company has a duty to deal with its insured "on a fair and frank basis, and at all times, to act in good faith." *Id.; Hollock v. Erie Ins. Exchange,* 842 A.2d 409, 416 (Pa.Super.2004) (holding that an insurer has a duty to act with the utmost good faith towards its insured). The duty of good faith originates from the insurer's status as a fiduciary for its insured under the insurance contract, which gives the insurer the right, *inter alia,* to handle and process claims. *See, e.g., Ridgeway v. U.S. Life Credit Life Ins. Co.,* 793 A.2d 972, 977 (Pa.Super.2002). The law implies this duty of good faith into the insurance contract, and thus the "breach of such an obligation constitutes a breach of the insurance contract...." *Gray v. Nationwide Mut. Ins. Co.,* 422 Pa. 500, 508, 223 A.2d 8, 11 (1966); *The Birth Ctr. v. The St. Paul Cos.,* 567 Pa. 386, 400, 787 A.2d 376, 385 (2001) (holding that the breach of the obligation to act in good faith "constitutes a breach of the insurance contract").

In 1990, our legislature created a statutory remedy for bad faith conduct by an insurance company:

**§ 8371. Actions on insurance policies**

In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:

(1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount

equal to the prime rate of interest plus 3%.

(2) Award punitive damages against the insurer.

(3) Assess court costs and attorney fees against the insurer.

42 Pa.C.S.A. § 8371.

■■■ In an early case, this Court looked to Black's Law Dictionary to define "bad faith" as "any frivolous or unfounded refusal to pay proceeds of a policy." *Terletsky v. Prudential Property and Cas. Ins. Co.*, 437 Pa.Super. 108, 649 A.2d 680, 688 (1994), *appeal denied*, 540 Pa. 641, 659 A.2d 560 (1995); *see also Adamski v. Allstate Ins. Co.*, 738 A.2d 1033, 1036 (Pa.Super.1999). In subsequent cases, we have held that to succeed on a claim under section 8371, the insured must show that "the insurer did not have a reasonable basis for denying benefits under the policy and that the insurer knew of or recklessly disregarded its lack of reasonable basis in denying the claim." *See, e.g., O'Donnell v. Allstate Ins. Co.*, 734 A.2d 901, 906 (Pa.Super.1999) (citing *MGA Ins. Co. v. Bakos*, 699 A.2d 751, 754 (Pa.Super.1997)). To constitute bad faith it is not necessary that the refusal to pay be fraudulent. However, mere negligence or bad judgment is not bad faith. *Bonenberger v. Nationwide Mut. Ins. Co.*, 791 A.2d 378, 380 (Pa.Super.2002). *Id.* The insured must also show that the insurer breached a known duty (*i.e.*, the duty of good faith and fair dealing) through a motive of self-interest or ill will. *Id.*

■■■ In explication of its first reason for entering a directed verdict in Nationwide's favor, the trial court stated as follows: "[T]he Bergs' claim for 'bad faith' is premised upon Nationwide's failure to *guarantee the repairs* that were made to their vehicle under the [BRRP], which they allege is a part of their automobile insurance policy." Trial Court Opinion, 6/3/11, at 9 (emphasis in original). This statement contains at least two basic misunderstandings. First, the Bergs' section 8371 claim is *not* based upon any guarantees associated with the BRRP program. We note that Count 11 of the Bergs' final amended complaint, entitled *"Insurer Bad Faith, Plaintiffs v. Nationwide,"* does not even mention the BRRP. Eighth Amended Complaint, ¶¶ 89–92. Moreover, as discussed in detail later in this Opinion, the Bergs offered specific evidence of Nationwide's alleged bad faith failure to comply with its contractual obligations under the Bergs' insurance contract. Based upon our review of the record on appeal, the Bergs' phase two trial brief, their post-trial motion and accompanying brief, and their appellate brief, it does not appear that the Bergs have *ever* alleged or attempted to prove that their section 8371 claim relies upon a failure to guarantee repairs under the BRRP. In fact, the Bergs have consistently alleged to the contrary.

Second, the Bergs bad faith claims are not premised on any contention that Nationwide's BRRP is a "part of" their automobile insurance policy with Nationwide. To the contrary, it was Nationwide, through the testimony of its expert witnesses, that introduced the notion that the BRRP was "different" from, and thus somehow not a "part of," the Bergs' policy. In particular, at the phase two trial, former Pennsylvania Insurance Commissioner Constance Foster testified at length that the BRRP was neither a part of the Bergs' policy nor an endorsement to that policy, and was instead a "separate" service that Nationwide offered that provided a repair guarantee to those who chose to use it. N.T., 6/5–11/07, at 626–27. According to Foster, when a Nationwide customer utilized the services of a BRRP facility, it was not service provided directly under the terms of an insurance policy—

and thus was not service "arising under an insurance policy" for purposes of section 8371. *Id.* at 627. In other words, Foster opined that claims processed at a BRRP facility are not claims arising under an insurance policy and thus Nationwide cannot be liable to any such customer for damages for acting in bad faith under section 8371. *Id.* at 627–28. Another Nationwide expert, Bruce Bashore, likewise testified that the BRRP is a "separate program completely" and that it had "nothing to do" with the Bergs' policy with Nationwide. *Id.* at 524.

In error, the trial court adopted as its legal conclusion this novel theory of statutory interpretation. This Court has interpreted the phrase "arising under an insurance policy" in section 8371 to provide for the statute's application in *any case* that originates "from a writing setting forth an agreement between the insured and insurer that the insurer would pay the insured upon the happening of certain circumstances." *Ridgeway,* 793 A.2d at 976. More recently, our Supreme Court has held that section 8371 applies in any action in which an insurer is called upon "to perform its contractual obligations of defense and indemnification or payment of a loss that failed to satisfy the duty of good faith and fair dealing implied in the parties' insurance contract." *Toy v. Metropolitan Life Ins. Co.,* 593 Pa. 20, 41, 928 A.2d 186, 199 (2007).[6]

 The Bergs' claim for bad faith damages under section 8371 is based upon Nationwide's alleged breach of its contractual duties as contained in the Bergs' insurance policy, including the duties of good faith and fair dealing. Eighth Amended Complaint, ¶¶ 6, 88–93. In their final amended complaint, the Bergs allege that subsequent to an accident, they contacted Nationwide to assert a claim for prompt payment under their policy, and that Nationwide acted in bad faith in not effectuating "the prompt, fair and equitable settlement of [the Bergs'] claim where [Nationwide's] statutory and contractual duty to do so is reasonably clear." *Id.* at ¶¶ 9, 93. Such legal theories may form the basis for a claim "arising under an insurance policy" under section 8371.

Evidence that the Bergs' participated in the BRRP in no way alters the conclusion that their claim in this case is one within the meaning of section 8371. After filing their claim with Nationwide, the Bergs had the choice either to have their vehicle appraised by a Nationwide representative and repaired at a third-party repair shop, or to take it to a BRRP-certified facility. As Nationwide expert Bruce Bashore made clear during his testimony, this was *merely a choice between two alternative methods of processing the Bergs' claim under the insurance policy:*

> The direct repair program. And a direct repair program is something that numerous insurance companies have. In its simplest terms, [*sic* ] you send the policyholder or claimant directly to a repair shop and they appraise the vehi-

---

**6.** In *Ridgeway,* this Court held that section 8371 does not apply after an insurance claim has been litigated to final judgment. *Ridgeway,* 793 A.2d at 976 (holding that a policyholder may not assert claim under section 8371 for failure to pay a judgment obtained in an insurance action). Conversely, in *Toy,* our Supreme Court held that a policyholder could not assert a section 8371 claim for conduct taking place before a policy claim arose or was asserted. *Toy,* 593 Pa. at 41, 928 A.2d at 199 (holding that bad faith conduct in connection with the solicitation of an insurance policy may not be the basis for a section 8371 claim). These decisions do not limit the Bergs' ability to assert their section 8371 claim in this case, however, since the alleged bad faith conduct here occurred during the processing of an actual claim.

cle and do the repairs. It eliminates the need for a Nationwide appraiser to go out and look at the vehicle. It actually speeds up the process.

N.T., 6/11/04, at 524.

In other words, the Bergs' insurance policy obligated Nationwide to pay for repairs "caused by collision or upset," and the BRRP was one of two alternative methods for Nationwide to fulfill this obligation. That the BRRP is not specifically mentioned in the insurance policy, or is "separate from" or "different than" the insurance policy (as Foster and Bashore testified), are distinctions without any relevant difference in this context. Because the Bergs' lawsuit involves allegations that Nationwide acted in bad faith during its processing of a claim under their insurance policy with Nationwide, it is an action "arising under an insurance policy" for purposes of section 8371. No language in the Bergs' insurance policy states, or even suggests, that participation in a direct repair program would constitute a waiver of their right to assert a claim under the policy, would convert a claim under the policy to a claim under repair guarantees made pursuant to the direct repair program, or would eliminate Nationwide's statutory and contractual obligations to act in good faith throughout the claim process. Finally, nothing in the statutory language of section 8371 provides any basis for concluding that the legislature intended for direct repair programs to be an exception to its application. To the contrary, whether processing claims for loss through a third party repair facility or through a direct repair program, insurers must at all times act in good faith vis-à-vis their insureds. Thus, we conclude that the trial court erred as a matter of law in deciding that the Bergs' claims did not "arise under an insurance policy" for purposes of section 8371.

■■■ The trial court's second basis for entering a directed verdict in Nationwide's favor was its contention that the Bergs were wrong in arguing that the jury's verdict in the phase one trial finding for the Bergs on their claim under the UTPCPL "was sufficient in and of itself to support a finding of 'bad faith' on Nationwide's part." Trial Court Opinion, 6/3/11, at 5. According to the trial court, the Bergs' argument regarding the UTPCPL relies "solely" on the *Romano* case, which reliance is "either carelessly or intentionally misplaced, because the Superior Court made it very clear that it was not deciding the case under the 'bad faith' statute, § 8371." *Id.* at 7.

Unfortunately, the trial court's arguments here reflect a clear misunderstanding of the nature of the Bergs' claims under section 8371. To unravel this confusion, we must first review our decision in *Romano.* Section 8371 does not contain a definition of the term "bad faith," and our decisions in *Terletsky* and *Romano* constitute early efforts to clarify the types of conduct actionable under the statute. As indicated hereinabove, in *Terletsky* we concluded that bad faith exists when the facts presented demonstrate a "frivolous or unfounded refusal to pay proceeds of a policy." *Terletsky,* 649 A.2d at 688. Conversely, in *Romano* we ruled that an insurer's bad faith could be predicated upon violations of other insurance statutes, even those for which no private right of action exists.

Specifically, *Romano* addressed a situation in which the insurer (Nationwide) and the insured disagreed over the value of a building destroyed by fire. Pursuant to a process set forth in the policy, the parties each selected an appraiser, who in turn together selected an umpire. The umpire reviewed the appraisals and determined the value of the structure to be substan-

tially in accordance with that recommended by the insured. Nationwide refused to pay the amount of the umpire's award, forcing the insured to have to file a petition in the Court of Common Pleas. The insured then moved for counsel fees pursuant to section 8371, contending that Nationwide's refusal to pay the umpire's award without the need for litigation was conduct in bad faith *per se* since it violated the Unfair Insurance Practices Act ("UIPA"), 40 P.S. § 1171.1 *et seq.* The trial court denied the motion on the grounds that the UIPA did not permit private rights of action and thus it had no jurisdiction to hear claims based on alleged violations of the UIPA. *Romano,* 646 A.2d at 1230.

This Court disagreed, indicating that the insured was not asking the trial court to enforce the UIPA. Instead, we concluded that the issue was whether an insured "may point to 'bad faith' conduct as defined in various provisions of the UIPA as a basis for recovery under 42 Pa.C.S.A. § 8371." *Id.* We answered this question in the affirmative. After noting the Black's Law Dictionary definition of "bad faith" in the insurance context (upon which we would later amplify in *Terletsky* ), we held as follows:

> The parameters of Section 8371 may also be discerned by reference to analogous Pennsylvania insurance law. Specifically, 'when the words of a statute are not explicit, the intention of the General Assembly may be ascertained by considering, among other matters ... (5) ... other statutes upon the same or similar subjects.' 1 Pa.C.S.A. § 1921. Section 1171.5 of the UIPA defines unfair methods of competition and unfair or deceptive acts or practices in the business of insurance. Particularly, and as noted above, Section 1171.5(a)(10)(vii) prohibits insurers from '[c]ompelling persons to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts due and ultimately recovered in actions brought by such persons.' 40 P.S. § 1171.5(a)(10)(vii). While the UIPA does not specifically refer to an insurer's 'bad faith,' the Supreme Court of Pennsylvania has utilized that term to describe conduct within the UIPA's reach.

> Although the trial court lacks the requisite jurisdiction to impose sanctions under the various provisions of the UIPA and insurance regulations, we find that the rules of statutory construction permit a trial court to consider, either *sua sponte* or upon the request of a party, the alleged conduct constituting violations of the UIPA or the regulations in determining whether an insurer, like Nationwide, acted in 'bad faith.'

> \* \* \*

> We find that a trial court, when evaluating a Section 8371 petition or motion for costs and/or counsel fees for the 'bad faith' of an insurer, may look to: (1) other cases construing the statute and the law of 'bad faith' generally; (2) the plain meaning of the term(s) used in the statute; and/or (3) other statutes upon the same or similar subjects (like the UIPA in this case).

*Id.* at 1233 (citations omitted).

Accordingly, under *Romano,* a plaintiff seeking damages for an insurer's bad faith conduct under section 8371 may, in addition to other available methods, attempt to prove bad faith by demonstrating that the insurer has violated one or more provisions of related Pennsylvania insurance statutes or regulations, even if those provisions do not provide for private rights of action. In the present case, the Bergs contend that Nationwide, by, *inter alia,* interfering with a total loss appraisal on

their vehicle and later returning it to them despite known structural deficiencies that left it in a potentially dangerous condition, violated two such statutory provisions: (1) the catchall provision of the UTPCPL, 73 P.S. § 201–2(4)(xxi), and (2) Pennsylvania's Motor Vehicle Physical Damage Appraiser Act, 63 P.S. §§ 861–63 (the "Appraisers Act").

With these points in mind, we conclude that the trial court erred in multiple respects. First, this Court in *Romano* clearly was deciding a case under section 8371, as the entire thrust of our decision was to determine the jurisdictional scope of section 8371 and, in so doing, to define the phrase "bad faith" under that provision. *Romano*, 646 A.2d at 1233 ("[A] trial court, when evaluating a Section 8371 petition or motion for costs and/or counsel fees for the "bad faith" of an insurer, may look to …"). That the plaintiff's claim for damages under section 8371 in *Romano* came in connection with a petition to enforce an umpire's award while here the Bergs' set forth their claim in their complaint, is a procedural distinction without relevance, since both *Romano* and this case equally involve claims for bad faith damages under section 8371.

█ Second, the Bergs have not argued that the phase one jury's finding against Nationwide on the UTPCPL claim "was sufficient in and of itself to support a finding of 'bad faith' on Nationwide's part." To the contrary, the Bergs have consis-

tently argued, in our view correctly, that the jury's finding that Nationwide violated the UTPCPL constitutes *some* evidence of bad faith conduct by Nationwide. In other words, because *Romano* holds that bad faith conduct may be defined by reference to violations of statutes related to insurance practices, the jury's finding that Nationwide violated the UTPCPL constitutes some evidence of Nationwide's bad faith. Because the jury was not asked to specify precisely what conduct by Nationwide it found to be fraudulent or deceptive under the UTPCPL, the overall probative value of this evidence of bad faith may be somewhat limited. But since a directed verdict may be granted "only where the facts are clear and there is no room for doubt," *Fetherolf*, 759 A.2d at 393, this evidence of bad faith was sufficient to preclude the entry of a directed verdict in Nationwide's favor.[7]

█ Third, the Bergs' claim for damages under section 8371 does not rely "solely" on the *Romano* case, as the trial court contends. Pursuant to *Romano*, the Bergs argue that violations of the UTPCPL and the Appraisers Act constitute bad faith under the statute. But they also offered evidence to establish multiple instances of bad faith conduct on Nationwide's part. In *Toy*, our Supreme Court recently reaffirmed that the term "bad faith" under section 8371 concerns "the duty of good faith and fair dealing in the

7. The Bergs made this argument, or some variation of it, to the trial court on several occasions in connection with the phase two proceedings. *See, e.g.,* Plaintiff Bergs' Position on Nationwide's Motion for Directed Verdict, 6/13/07, at 11 ("The jury's finding that Nationwide engaged in fraudulent and/or deceptive conduct during the appraisal and repair of [the Bergs'] collision claim, under the [UTPCPL], supports a finding of insurer bad faith."); Plaintiff Bergs' Motion for Post–Trial Relief, 7/20/07, at 13 ("Thus, in granting Na-

tionwide's Motion for Directed Verdict, the [c]ourt must have determined that the evidence giving rise to the jury's finding of fraud and/or deceit was not relevant to whether Nationwide treated the Bergs in good faith and with fair dealings."); *see also* Bergs' Brief at 31 ("Inasmuch as the Bergs secured a jury finding that Nationwide engaged in fraud and/or deceit in the handling of the Bergs' insured loss, a directed verdict in favor of the insurer on the issue of insurer bad faith is completely erroneous.").

parties' contract and the manner in which an insurer discharged . . . its obligation to pay for a loss in the first party claim context." *Toy*, 593 Pa. at 41, 928 A.2d at 199 (citing *Cowden v. Aetna Casualty and Surety Co.*, 389 Pa. 459, 468, 134 A.2d 223, 227 (1957) and *D'Ambrosio v. Pennsylvania Nat. Mut. Cas. Ins. Co.*, 494 Pa. 501, 505, 431 A.2d 966, 968 (1981)).

Much of the evidence introduced by the Bergs at the bifurcated trial regarding Nationwide's conduct in connection with the processing of their repair claim satisfies the *Toy* definition of bad faith under section 8371. For example, the Bergs offered evidence to show that when they took their vehicle to Lindgren for repairs, the appraiser (Mr. Doug Joffred) initially concluded that the vehicle's frame was too twisted and thus could not be repaired. Bergs' Amended Trial Brief at 2–3; N.T., 12/13–17/04, at 209, 241, 299, 629, 729. According to the Bergs, however, the evidence shows that Nationwide reversed this appraisal and (without advising the Bergs) instead ordered that the vehicle be sent to another repair facility to attempt structural frame repairs. Bergs' Amended Trial Brief at 3; N.T., 12/13–17/04, at 630, 641, 685–86. The Nationwide claims log suggests that this move was ordered because "Nationwide will never recover the difference in salvage value." Bergs' Amended Trial Brief at 3; N.T., 12/13–17/04, at Exhibit 8 p. 65. The Bergs argue that Nationwide sent the vehicle to another repair facility to avoid having to pay the cost of a total loss payment at that time, as would have been required under the insurance policy if the vehicle could not be repaired. Bergs' Amended Trial Brief at 2–4.

The Bergs also presented evidence to show that after four months of attempted repairs, Nationwide returned the vehicle and represented to them that repairs had been successfully completed, even though its representatives had actual knowledge that the repairs had failed and that the vehicle's frame was structurally unsound. Uncontested Facts at ¶ 6; Bergs' Amended Trial Brief at 6; N.T., 12/13–17/04, at 387–88; 892–96. Despite this knowledge, Nationwide again failed to advise the Bergs of any problem with their vehicle, according to the Bergs in its continuing effort to avoid having to incur a total loss payment under the insurance policy. Bergs' Amended Trial Brief at 6–7; N.T., 12/13–17/04, at 387–88. Finally, as discussed *infra* in connection with the Bergs' third issue on appeal, the Bergs attempted to offer evidence that when they filed suit, Nationwide utilized a litigation strategy emphasizing a lack of cooperation with policyholders retaining legal counsel and aggressive efforts in handling cases under $25,000 to create a "defense-minded" perception in the legal community. Bergs' Amended Trial Brief at 6–7 n. 6; N.T., 6/5–11/07, at 106–111.

For all of these reasons, we conclude that the trial court erred in entering a directed verdict in Nationwide's favor with respect to the Bergs' section 8371 claims. As a result, we reverse the trial court's entry of judgment and remand the case for a new trial. At trial on remand, the Bergs will again have the burden to prove their allegations by clear and convincing evidence. *Adamski v. Allstate Ins. Co.*, 738 A.2d 1033, 1036 (Pa.Super.1999); *Hall v. Brown*, 363 Pa.Super. 415, 420, 526 A.2d 413, 415 (1987). If the Bergs meet this high burden, the trial court shall award damages as specified in section 8371.

 For their third issue on appeal, the Bergs contend that the trial court erred in refusing to admit evidence that Nationwide paid its attorneys $922,654.25 to defend the lawsuit, allegedly pursuant to a documented litigation strategy to deter the filing of small value claims. Our

standard of review for evidentiary rulings requires us to determine whether the trial court abused its discretion. *Commonwealth v. Henkel,* 938 A.2d 433, 440 (Pa.Super.2007), *appeal denied,* 598 Pa. 756, 955 A.2d 356 (2008).

■■■■■ This Court's decision in *Bonenberger v. Nationwide Mut. Ins. Co.,* 791 A.2d 378 (Pa.Super.2002), governs this issue. In *Bonenberger,* we affirmed a trial court's decision to award attorneys' fees and punitive damages for Nationwide's bad faith conduct, which included the use of an internal practice manual detailing various aggressive litigation tactics intended to create a perception that Nationwide was a " 'defense-minded' carrier in the minds of the legal community." *Id.* at 381–82. In particular, we ruled that the procedures manual constituted "relevant evidence and offers support for the court's ultimate finding of bad faith." *Id.* at 382.

> Individuals expect that their insurers will treat them fairly and properly evaluate any claim they may make. A claim must be evaluated on its merits alone, by examining the particular situation and the injury for which recovery is sought. An insurance company may not look to its own economic considerations, seek to limit its potential liability, and operate in a fashion designed to 'send a message.' Rather, it has a duty to compensate its insureds for the fair value of their injuries. Individuals make payments to insurance carriers to be insured in the event coverage is needed. It is the responsibility of insurers to treat their insureds fairly and provide just compensation for covered claims based on the actual damages suffered. Insurers do a terrible disservice to their insureds when they fail to evaluate each individual case in terms of the situation presented and the individual affected. Thus, a company manual, which dictates

a certain philosophy in claims handling, may be relevant and useful in evaluating a bad faith claim.

*Id.*

The Bergs sought to introduce evidence of Nationwide's litigation strategy and practices in this case for substantially identical reasons as those outlined in *Bonenberger.* The Bergs contend that Nationwide implemented a litigation strategy that called for aggressive tactics designed to deter the filing of small claims. Bergs' Brief at 50. They further contend that Nationwide documented this litigation strategy in a claims processing manual ("Best Claims Practices"), and that as a result, the trial court erred in refusing to permit testimony regarding the amounts paid by Nationwide to its attorneys in this case. Bergs' Brief at 49–55. Based upon *Bonenberger,* we agree and conclude that on retrial the Bergs should be permitted, subject to the laying of a proper foundation and authentication of any related documents, to introduce evidence regarding Nationwide's alleged litigation strategy in an effort to establish bad faith conduct under section 8371.

■■■■ In its written Rule 1925(a) opinion, the trial court does not cite to our decision in *Bonenberger,* and instead posits that the evidence regarding Nationwide's litigation strategy was not relevant because (1) the Bergs' bad faith claim does not arise under their automobile policy, and (2) the Bergs were "unable to establish that they were denied any benefits under that policy." Trial Court Opinion, 6/3/11, at 13. We have already addressed (and rejected) the first argument. With regard to the second argument, we find the trial court's focus on the alleged lack of denial of benefits to be confusing in light of the text of section 8371, which sets forth no such requirement to be entitled to damages for the insurer's bad faith. To the

contrary, the focus in section 8371 claims cannot be on whether the insurer *ultimately* fulfilled its policy obligations, since if that were the case then insurers could act in bad faith throughout the entire pendency of the claim process, but avoid any liability under section 8371 by paying the claim at the end. As our Supreme Court in *Toy* explained, the issue in connection with section 8371 claims is the *manner* in which insurers discharge their duties of good faith and fair dealing during the pendency of an insurance claim, not whether the claim is eventually paid. *Toy*, 593 Pa. at 41, 928 A.2d at 199. For purposes of the Bergs' section 8371 claim, whether Nationwide ultimately paid the benefits due under the policy is not the relevant inquiry; instead the dispute is whether Nationwide acted in bad faith in its dealings with the Bergs.

 The Bergs' fourth and fifth issues on appeal involve disputes regarding Nationwide's alleged concealment of relevant evidence through false assertions of attorney-client privilege.[8] Specifically, the Bergs contend that the trial court erred in refusing to conduct an *in camera* review of approximately 30 redactions to Nationwide's claims log, which detailed pertinent events and correspondence relating to the repairs to the Bergs' vehicle. The Bergs posit that these log entries may bear directly on the issue of Nationwide's "state of mind" when it permitted their vehicle to be returned to them with failed structural repairs, and are thus relevant to the determination of the appropriate amount of damages to which they are entitled under section 8371. Bergs' Brief at 68–69.

Nationwide initially produced its claims log, with redactions, in April 1999 in response to an order of court dated March 15, 1999. On June 8, 2000, the Bergs filed a motion for discovery sanctions, including for Nationwide's allegedly improper redactions. On June 12, 2000, the trial court responded with an order of court that required Nationwide to "fully comply" with prior discovery orders, but refused the Bergs' requests for sanctions or a privilege log. On February 3, 2004, the Bergs filed another motion for sanctions for Nationwide's continued refusal to produce an unredacted claims log, this time demanding an *in camera* review of the redactions. In an opinion dated September 8, 2004, the trial court denied the Bergs' motion for sanctions and *in camera* review as untimely, pointing out that the Bergs had failed to file a praecipe for argument after its filing in February, that it has already decided motions for summary judgment, including one filed by the Bergs, and the parties had certified the case ready for trial (with jury selection scheduled to begin in less than three weeks). Trial Court Opinion, 9/8/04, at 5–6. For these reasons, the trial court concluded that the Bergs' attempt "to have the [c]ourt rule on this motion at this late juncture is inappropriate." *Id.* at 6.

On the morning of the first day of trial in December 2004, the trial court bifurcated the trial, delaying consideration of the Bergs' claim for bad faith damages under section 8371 to a second phase trial at a later date. After the conclusion of the first phase of the trial, both parties sought new discovery in connection with the Bergs' section 8371 claim. Nationwide

---

**8.** "Our standard of review when determining the propriety of a discovery order is whether the trial court committed an abuse of discretion." *Sabol v. Allied Glove Corp.*, 37 A.3d 1198, 1200 (Pa.Super.2011) (citing *Gormley v. Edgar*, 995 A.2d 1197, 1202 (Pa.Super.2010)).

Pa.R.C.P. 4003.1 provides that "as a general rule, discovery is liberally allowed with respect to any matter, not privileged, which is relevant to the cause being tried." Pa.R.C.P. 4003.1; *see, e.g., George v. Schirra*, 814 A.2d 202, 204 (Pa.Super.2002).

propounded new interrogatories, requests for the production of documents, and notices of deposition for five of the Bergs' attorneys. The Bergs in turn sought answers to requests for admissions and copies of billings from Nationwide's attorneys. On August 15, 2005, the trial court reopened discovery and granted all of the above-referenced discovery relating to the Bergs' section 8371 claim.

On October 7, 2005, however, the trial court issued an order denying the Bergs' renewed motion for production of an unredacted claims log or, in the alternative, an *in camera* review by the trial court. The trial court's order offered no explanation for its decision.

In our view, the trial court's October 7, 2005 order constituted an abuse of discretion. The trial court's prior reasons for denying the Bergs' request for production and/or *in camera* review of the redactions to the claims log no longer applied, as the phase two portion of the trial was not imminent (or even scheduled), and neither party had certified their readiness for the second phase of trial. To the contrary, the trial court had reopened discovery on the Bergs' section 8371 claim, and the Bergs' renewed motion for discovery of the claims log was not untimely. In addition, the Bergs' renewed motion set forth facially valid reasons to compel an *in camera* review of the redactions, including (1) in May 2003, Nationwide had unredacted a claims log entry in response to a discovery request, and the entry was not a privileged communication, and (2) many of the redacted entries in the claims log pre-dated Nationwide's retention of counsel in connection with the Bergs' insurance claim.

This Court has made clear that in bad faith insurance litigation, the fact finder needs to consider "all of the evidence available" to determine whether the insurer's conduct was "objective and intelligent un-der the circumstances." *The Birth Center v. The St. Paul Companies, Inc.,* 727 A.2d 1144, 1166 (Pa.Super.1999), *affirmed,* 567 Pa. 386, 787 A.2d 376 (2001); *see also Rhodes v. USAA Casualty Ins. Co.,* 21 A.3d 1253, 1263–64 (Pa.Super.2011). *In camera* review of disputed claims of privilege is often necessary and appropriate. *See* Pa.R.C.P. 4003.3 ("[D]iscovery and inspection should be permitted *in camera* where required to weed out protected material."); *see generally Barrick v. Holy Spirit Hospital of the Sisters of the Christian Charity,* 32 A.3d 800, 812 (Pa.Super.2011) ("*in camera* review may be necessary" to determine privilege issues); *T.M. v. Elwyn, Inc.,* 950 A.2d 1050, 1063 (Pa.Super.2008) (remand required for trial court to conduct *in camera* examination of documents for privilege); *In re Estate of Wood,* 818 A.2d 568, 573 (Pa.Super.2003) (remand with instructions to conduct *in camera* review for privilege issues), *appeal denied,* 584 Pa. 696, 882 A.2d 479 (2005). Accordingly, in light of the importance of a clear focus on the insurer's conduct in a section 8371 bad faith claim, prior to retrial of the Bergs' section 8371 claim, the trial court should conduct an *in camera* review of all disputed documents to resolve claims of privilege.

Judgment vacated. Case remanded to the trial court for a new trial on the Bergs' claim pursuant to 42 Pa.C.S.A. § 8371. Jurisdiction relinquished.

STRASSBURGER, J. files a Concurring and Dissenting Opinion.

Concurring and Dissenting Opinion by STRASSBURGER, J.:

I join the majority opinion in all respects except the requirement imposed upon the trial court in resolving the outstanding discovery dispute. I respectfully dissent to the portion of the opinion mandating that

trial court review the documents *in camera.*

I believe that *in camera* inspection of disputed documents should be undertaken only in rare circumstances. As noted by the Honorable R. Stanton Wettick, Jr., the judge presiding over discovery matters in the Civil Division of the Allegheny County Court of Common Pleas, "review of documents *in camera* is likely to raise more questions than it answers." R. Stanton Wettick, Jr., *The Operation of Our Discovery Rules in the Context of the Production of Documents,* THE BARRISTER, Summer 1990, at 36. Without the benefit of input from counsel, a trial judge is "frequently not in a position to make an informed judgment concerning the discoverability of a document." *Id.* Further, if *in camera* inspection of documents is used regularly and frequently to resolve discovery disputes, the parties from whom documents are sought "are less likely to assume responsibility for compliance with the discovery rules[,]" and "may take the position that compliance has become the court's responsibility[.]" *Id.*

None of the cases cited by the majority supports our requiring the trial court to conduct a review of the documents *in camera. See, e.g., Barrick v. Holy Spirit Hospital of the Sisters of the Christian Charity,* 32 A.3d 800, 812 (Pa.Super.2011) (acknowledging that *in camera* review **may be** necessary upon remand), *T.M. v. Elwyn, Inc.,* 950 A.2d 1050, 1063 (Pa.Super.2008) (noting that the case lacked any privilege log, and that if the responding party was able to identify privileged material upon remand, the trial court "may" conduct *in camera* review of those documents), *In re Estate of Wood,* 818 A.2d 568, 573 (Pa.Super.2003) (instructing the trial court to review material *in camera* only if the party is uncertain what is discoverable under the applicable order).

"Discovery rulings are 'uniquely within the discretion of the trial judge[.]'" *Rohm and Haas Co. v. Lin,* 992 A.2d 132, 143 (Pa.Super.2010) (quoting *George v. Schirra,* 814 A.2d 202, 204 (Pa.Super.2002)). "The trial court is responsible for overseeing 'discovery between the parties and therefore it is within that court's discretion to determine the appropriate measures necessary to insure adequate and prompt discovery of matters allowed by the Rules of Civil Procedure.'" *Id.* (quoting *Berkeyheiser v. A–Plus Investigations, Inc.,* 936 A.2d 1117, 1125 (Pa.Super.2007)).

In the course of discovery in the instant case, the Bergs first requested a privilege log, then *in camera* review of the disputed documents. Majority Memorandum at 27. As the trial court noted, it never made any ruling on the merits of the Bergs' requests. Trial Court Opinion, 9/8/2004, at 6. While I agree with the majority that the trial court abused its discretion in denying the Bergs' motion as untimely, upon remand I would allow the trial court its full range of discretion in determining how to assure that the Bergs get the documents to which they are entitled.[1]

---

1. For example, when a party has withheld documents or portions thereof, Judge Wettick employs the practice of requiring counsel to file an affidavit which states that counsel has personally reviewed the withheld documents and details the factual and legal basis for withholding the information. Wettick, *supra,* at 36. "This affidavit assures me that counsel of record (rather than the client or in-house counsel) has assumed responsibility for the decision. Also, I believe that counsel will not

file such an affidavit without carefully review-ing the documents." *Id.*