MAVERICK STEEL COMPANY,
L.L.C., Appellant

v.

DICK CORPORATION/BARTON MA-
LOW, A Joint Venture; Dick Corpora-
tion And Barton Malow Company, Ap-
pellees

Superior Court of Pennsylvania.

Argued Jan. 10, 2012.
Filed Aug. 21, 2012.
Reargument Denied Oct. 25, 2012.

James R. Cooney, Pittsburgh, for appellant.

John T. Bergin, NW Washington, DC, for appellees.

BEFORE: FORD ELLIOTT, P.J.E., SHOGAN and COLVILLE *, JJ.

OPINION BY SHOGAN, J.:

Appellant, Maverick Steel Company ("Maverick") appeals from the judgment entered on a directed verdict in favor of Dick Corporation, Barton Mallow Company, and their joint venture Dick Corporation/Barton Malow ("DBM"). We reverse and remand.

Maverick's predecessor, Wilhelm & Kruse, Inc. ("W & K"), provided products and services for the PNC Stadium construction project ("Stadium Project") pursuant to a structural steel subcontract with DBM. Claiming that W & K defaulted on its contract, DBM issued a default notice and sought coverage from W & K's surety, United States Fidelity and Guarantee ("USF & G"). In response, Maverick claimed that any delays in W & K's performance were the result of circumstances beyond its control and that DBM extorted money from USF & G to cover the cost of the Stadium Project. According to Maverick, DBM intimidated and threatened USF & G into paying millions of dollars into the Stadium Project, thereby interfering with the surety relationship between USF & G and W & K. Consequently, W & K lost other contracts because it had no surety, and W & K's creditors threw it into involuntary bankruptcy. Maverick, which arose out of W & K's involuntary bankruptcy, filed a lawsuit against DBM, averring breach of contract, fraud, conspiracy, trade libel, and intentional interference with business relationships.

After Maverick voluntarily withdrew multiple claims, Judge Wettick dismissed Maverick's libel claim as time barred under the one-year statute of limitations. Also, Judge Wettick denied DBM's pre-

---

* Retired Senior Judge assigned to the Superior Court.

trial motions for judgment on the pleadings and summary judgment with regard to Maverick's intentional interference counts. Eventually, only the count related to W & K's relationship with USF & G on projects other than the Stadium Project ("interference claim") went to trial before Judge O'Brien. Maverick argued that it based the interference claim on DBM's course of conduct in extorting money from USF & G and, therefore, the claim was subject to a two-year statute of limitations. According to DBM, however, the gravamen of Maverick's interference claim was the alleged libel of DBM telling USF & G that W & K defaulted on its contract. DBM argued, therefore, that the interference claim was time barred under the one-year statute of limitations for libel. Judge O'Brien requested post-trial memoranda on the statute of limitations issue. He then found that the one-year statute of limitations barred Maverick's interference claim because it was libel-based, granted DBM's motion for directed verdict, and entered judgment for DBM. Maverick moved for post-trial relief, which the trial court denied. This appeal followed.

Maverick presents the following questions for our consideration:

1. Did the Court err in holding that the Appellant's claim for tortious interference was governed by the one year statute of limitations for trade libel?

2. Did the Court err in concluding that the "gravamen" of Maverick's interference claims was based on the commission of the tort of trade libel?

3. Did the Court err in relying upon the case of *Evans v. Philadelphia Newspapers, Inc.*, 411 Pa.Super. 244, 601 A.2d 330 (1991)?

4. Did the Appellant offer sufficient evidence to establish a viable claim for tortious interference under Pennsylvania law?

5. Did the Court's decision violate the law of the case doctrine and/or the principle that judges of coordinate jurisdiction may not overrule each other?

Maverick's Brief at 4.

 Maverick's first three issues challenge the trial court's ruling that the one-year statute of limitations for trade libel barred Maverick's interference claim. The issue of which limitations period applies to a particular cause of action is a question of law. *Burger v. Blair Medical Associates*, 600 Pa. 194, 202, 964 A.2d 374, 378 (2009). When faced with questions of law, our scope of review is plenary and our standard of review is *de novo*. *Skonieczny v. Cooper*, 37 A.3d 1211, 1213 (Pa.Super.2012) (citation omitted).

 This case implicates two causes of action arising out of the commercial business arena: trade libel and intentional interference with contractual relations. Trade libel, also called "injurious falsehood," consists of the publication of a disparaging statement concerning the business of another and is actionable where:

(1) the statement is false; (2) the publisher either intends the publication to cause pecuniary loss or reasonably should recognize that publication will result in pecuniary loss; (3) pecuniary loss does in fact result; and (4) the publisher either knows that the publication is false or acts in reckless disregard of its truth or falsity.

*Pro Golf Manufacturing, Inc. v. Tribune Review Newspaper Company*, 570 Pa. 242, 246, 809 A.2d 243, 246 (2002). This tort is subject to a one-year statute of limitations. *Evans v. Philadelphia Newspapers, Inc.*, 411 Pa.Super. 244, 601 A.2d 330, 333 (1991).

 Tortious interference with prospective or existing contractual relations consists of the following elements:

(1) the existence of a contractual, or prospective contractual relation between the complainant and a third party;

(2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring;

(3) the absence of privilege or justification on the part of the defendant; and

(4) the occasioning of actual legal damage as a result of the defendant's conduct.

In determining whether a particular course of conduct is improper for purposes of setting forth a cause of action for intentional interference with contractual relationships, or, for that matter, potential contractual relationships, the court must look to section 767 of the Restatement (Second) of Torts. This section provides the following factors for consideration: 1) the nature of the actor's conduct; 2) the actor's motive; 3) the interests of the other with which the actor's conduct interferes; 4) the interests sought to be advanced by the actor; 5) the proximity or remoteness of the actor's conduct to interference, and 6) the relationship between the parties.

*Steffy & Son, Inc. v. Citizens Bank of Pennsylvania*, 7 A.3d 278, 288 (Pa.Super.2010) (quoting *Strickland v. Univ. of Scranton*, 700 A.2d 979, 985 (Pa.Super.1997) (citations omitted)).

Usually, the tort of contractual interference is subject to a two-year statute. 42 Pa.C.S.A. 5524; *Eagan v. U.S. Expansion Bolt Co.*, 322 Pa.Super. 396, 469 A.2d 680 (1983); *Bednar v. Marino*, 435 Pa.Super. 417, 646 A.2d 573 (1994). However, we have held that the one-year statute of limitations for defamation applies to a tortious interference claim where the interference claim is based on defamatory statements. *Evans*, 601 A.2d at 334–335.

Here, after hearing closing arguments at the end of a month-long bench trial, the trial court "decided to order briefs on [DBM's] time-bar argument only, as it showed promise and was relatively straightforward." Trial Court Opinion, 2/9/11, at 2. Based on the parties' post-trial briefs and *Evans*, a media libel case, the trial court concluded that, "the gravamen of [Maverick's] action for interference with [its] contractual relationship [with USF & G] is based on the commission of [the] tort [of trade libel]." *Id.* at 7 (quoting *Evans*, 601 A.2d at 333; bracketed material in original). Consequently, the trial court held that the statute of limitations for trade libel must govern. *Id.* Because Maverick filed its interference claim more than a year after the June 8, 2000 default notice, the trial court ruled that it was time barred and entered a directed verdict in favor of DBM.

On appeal, Maverick claims that "publication of the false default notice was only 'incidental' to DBM's continuing course of conduct to wrongfully interfere with Maverick's existing and future contractual relationships." Maverick's Brief at 17. It distinguishes *Evans* with evidence of DBM's interference: "DBM engaged in a continuing course of conduct, with the clear intent to interfere with [W & K's] contractual relationship with [USF & G], by wrongfully extorting funds from [USF & G] to help subsidize the cost to complete the structural steel work." Maverick's Brief at 19. DBM counters that W & K was incapable of performing its structural steel subcontract; consequently, when W & K defaulted, DBM notified USF & G in writing, seeking coverage under the performance bond. DBM's Brief at 14, 26. The trial court agreed with DBM, stating:

DBM was simply demanding that USF & G live up to its obligations under the surety agreement, which DBM had a right to do unless DBM was *falsely* alleging that W & K was in default. Such conduct can only theoretically constitute coercion or extortion if DBM's allegations were false, i.e., if DBM *defamed* W & K. . . . Thus, the policy considerations for a one-year statute of limitations apply to the instant case, just as they applied in *Evans.*

Trial Court Opinion, 2/9/11, at 7.

Based on our *de novo* review of the record, we do not agree with the trial court's conclusion that Maverick's interference claim was based solely on the tort of trade libel. Thus, we are compelled to answer Maverick's first three questions in the affirmative and to conclude that the trial court erred in entering a directed verdict for DBM.

In reviewing the trial court's entry of a motion for a directed verdict, "our scope of review is limited to determining whether the trial court abused its discretion or committed an error of law that controlled the outcome of the case." *Fetherolf v. Torosian,* 759 A.2d 391, 393 (Pa.Super.2000). "A directed verdict may be granted only where the facts are clear and there is no room for doubt." *Id.* (quoting *Lear, Inc. v. Eddy,* 749 A.2d 971, 973 (Pa.Super.2000)). "In deciding whether to grant a motion for a directed verdict, the trial court must consider the facts in the light most favorable to the nonmoving party and must accept as true all evidence which supports that party's contention and reject all adverse testimony." *Id.*

*Berg v. Nationwide Mut. Ins. Co., Inc.,* 44 A.3d 1164, 1170 (Pa.Super.2012).

In deciding the statute of limitations question, the trial court recognized that "[o]ne fact central to [Maverick's] Second Amended Complaint is that DBM published its contention that W & K defaulted on its sub-contract. Count XI, entitled 'Trade Libel,' characterized this contention as defamatory. Judge Wettick ruled that Count XI was barred by the one-year statute of limitations." Trial Court Opinion, 2/9/11, at 3. However, that "one fact," while central to Maverick's time-barred trade libel claim, was only one of many facts proffered by Maverick as *prima facie* evidence of DBM's interference. Maverick and the trial court identified some of those other facts as follows:

(1) DBM's May 17, 2000 letter to W & K's bonding agent, which threatened that USF & G's failure to take all necessary steps to insure W & K's satisfactory and timely performance of its sub-contract obligations would have "grave financial consequences;"

(2) the May 23, 2000 meeting, at which a DBM official demanded that USF & G fund the cost of completion of the job;

(3) a June 2, 2000 letter from DBM's attorney demanding that USF & G immediately provide DBM with written assurance that USF & G would provide the necessary funding; (4) DBM's June 6, 2000 letter to USF & G to the same effect[.]

Trial Court Opinion, 2/19/11, at 6 (citing Maverick's post-trial reply brief at 3–4). Notably, in the June 2, 2000 letter, DBM's counsel demanded that USF & G ensure W & K's performance based on W & K's financial status and its claim for cost overruns—not on W & K's failure to perform in a timely manner. Appendix to Brief in Opposition to Motion for Summary Judgment, 9/5/08, at Exhibit 27. Over DBM's objection, the trial court admitted the June 2, 2000 letter as evidence of DBM's motive. N.T. (Trial), 11/1/10–12/9/10, at 392. In the June 6, 2000 letter, DBM demanded that USF & G ensure performance of the

contractual obligations based on W & K's financial status and claims for cost overruns; then, it adds that W & K "continually fails to deliver steel per the delivery dates." Maverick's Trial Exhibit 215. Neither of these letters contains any defamatory statements; however, they suggest that DBM was targeting USF & G as a source of funds for the structural steel work.

The record contains additional evidence of non-defamatory facts on which Maverick based its interference claim: Due to third-party delays, the structural steel costs nearly doubled from W & K's original estimates. N.T. (Trial), 11/1/10–12/9/10, at 408–412, 1731–1733, 1738–1741, 1902, 1908–1910, 2554–2555, 2654–2655, 2669, 2731, 2734–2635. To cover cost overruns and continue its work, W & K requested 4.3 million dollars from DBM in the spring of 2000. *Id.* at 1441–1442, 1879, 1911, 2554–2555, 2569–2570, 2666, 2795–2796, 2812, 2969, 3116. However, DBM was running out of money for the structural steel component of the Stadium Project as of April 2000. *Id.* at 2666–2668, 2731, 2734–2735, 2812, 2857, 2919–2920, 2930–2933, 3391. So, DBM sought funding from, *inter alia,* Maverick's surety, USF & G, to ensure completion of the Stadium Project. *Id.* at 387–388, 393–394. Pursuant to DBM's May 3, 2000 memo regarding the "Wilhelm–Kruse Claim Action Plan," John Reich was responsible for a "Polite notification of Wilhelm–Kruse bonding company." Appendix to Brief in Opposition to Motion for Summary Judgment, 9/5/08, at Exhibit 21. DBM official George Harakal acknowledged that DBM would "short-cut" with a bonding company to "make sure they're going to step up and take care of business." N.T. (Trial),

11/1/10–12/9/10, at 3285. DBM wanted USF & G to "step up" and fund the costs to complete the structural steel work. *Id.* at 3288–3289, 3344. In fact, DBM threatened "grave financial consequences," "serious consequences to all parties," bad-faith litigation, and "tremendous financial exposure" if USF & G did not comply. DBM's Trial Exhibit 76; Maverick's Trial Exhibits 215, 452, 469. Recognizing that it was not contractually bound to spend its own money to subsidize the structural steel overruns not caused by W & K, USF & G refused to capitulate to DBM's demands, stating, "That's not what we do." N.T. (Trial), 11/1/10–12/9/10, at 620; Maverick's Exhibit 229. Nevertheless, due to DBM's positioning, USF & G placed a hold on bonding Maverick as of May 18, 2000, and, in order to save the Stadium Project, agreed to enter into the Interim Funding Agreement ("IFA") with DBM on July 12, 2000. N.T. (Trial), 11/1/10–12/9/10, at 450, 613–616, 636, 643, 735, 1264, 3042.

Given our standard of review, we must consider the above evidence in the light most favorable to Maverick as the non-moving party and accept as true all evidence which supports its interference claim. *Berg,* 44 A.3d at 1170. In doing so, we conclude that the gravamen of Maverick's claim was that DBM intentionally and wrongfully engaged in course of conduct and communications—leading up to and culminating in the June 8, 2000 default notice—which were designed to extract money from USF & G and resulted in the premature termination of W & K's relationship with its surety. Without addressing the merits of Maverick's interference claim,[1] we further conclude that the claim as presented is separate and distinct from libel or slander. *Accord Evans,* 601 A.2d

---

1. We leave that job to the fact finder who must consider Maverick's claims regarding DBM's conduct in light of the elements of tortious interference with contractual relations and the factors listed in section 767 of the Restatement (Second) of Torts.

at 333 ("[T]he tort of contractual interference is recognized in Pennsylvania and ... the action may be a separate and distinct action from that of libel or slander."). Consequently, we hold that the trial court's application of the one-year trade libel statute of limitations to the interference claim was erroneous. Maverick's interference claim was subject to the two-year statute of limitations set forth in 42 Pa.C.S.A. 5524. Because Maverick filed its interference claim within the two-year period, the claim was not time-barred.[2] Because Maverick's interference claim was not time-barred, the trial court committed an error of law in directing the verdict in favor of DBM.

 In support of its fourth issue, Maverick argues that it "established a prima facie case for intentional interference under Pennsylvania law." Maverick's Brief at 24. It then provides argument and citations in support of each element of an intentional interference claim. *Id.* at 25–38. In response, DBM argues that "this Court should completely ignore Maverick's fourth question" because it is not properly before the Court. DBM's Brief at 2. We agree with DBM.

Upon review, we conclude that Maverick's sufficiency argument challenges the entry of the directed verdict on substantive grounds. However, the trial court entered the directed verdict based on its resolution of the procedural facet of the case—the statute of limitations—not on the substantive merits of Maverick's inter-

ference claim. In response to Maverick's challenge, the trial court explained:

I did not rule that DBM's conduct "could only constitute trade libel." This statement seems to imply I rule that plaintiff failed to establish tortious interference. It was not necessary, however, for me to make such a ruling because I found the tortious interference claim time barred.... Because plaintiff's claim is time barred, it was not necessary for me to rule whether DBM had a right to demand anything or whether its default allegation was false.

Trial Court Opinion, 4/19/11, at 1–2.

Because the trial court did not adjudicate the merits of Maverick's interference claim, we cannot encroach on the trial court's purview as the ultimate trier of fact in order to resolve this case during the instant appeal. *Accord In re Adoption of M.R.B.*, 25 A.3d 1247 (Pa.Super.2011) ("Since the orphans' court did not engage in the needs and welfare analysis pursuant to § 2511(b), we remand the matter for the orphans' court to address that statutory requirement."). Thus, we are constrained to remand this matter to the trial court for a resolution of Maverick's interference claim on its merits.

Finally, Maverick argues that Judge Wettick's two rulings on the interference claim are the law of the case. Given our resolution of Maverick's first three issues regarding the correct statute of limitations and our remand for a disposition on the merits, we consider Maverick's final issue

---

**2.** In light of our conclusion that Maverick's interference claim was not libel-based and, therefore, time-barred, the trial court's reliance on *Evans* is misplaced. In *Evans*, the trial court found that, although the appellants had adequately pled a tortious interference claim, the cause of action was barred by the statute of limitations, nevertheless, because the complaint referred specifically to only one allegedly defamatory statement (the Daily News article of September 23, 1986) and suit was not filed until October 2, 1987. We agreed. *Evans*, 601 A.2d at 332. Here, Maverick's contention is that DBM engaged in a course of conduct intended to interfere with W & K's contractual relationships with its surety, which course of conduct culminated in an allegedly defamatory publication; hence, *Evans* is inapposite.

to be moot; therefore, we will not address it. *See City of Philadelphia v. Philadelphia Parking Authority,* 568 Pa. 430, 798 A.2d 161 (2002) (remanding for disposition on merits after resolving jurisdictional issue).

Judgment reversed. Case remanded for further proceedings consistent with this opinion. Jurisdiction relinquished.