J-A12007-17

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | |
|---|---|
| MAVERICK STEEL COMPANY L.L.C. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| DICK CORPORATION/BARTON MALOW, A JOINT VENTURE; DICK CORPORATION AND BARTON MALOW COMPANY | |
| Appellees | No. 236 WDA 2016 |

Appeal from the Judgment Entered March 9, 2016
In the Court of Common Pleas of Allegheny County
Civil Division at No(s): GD 02-005580

BEFORE: OLSON, J., SOLANO, J., and RANSOM, J.

MEMORANDUM BY SOLANO, J.:                    FILED DECEMBER 27, 2017

Appellant Maverick Steel Company L.L.C. ("Maverick"), the corporate successor to Wilhelm & Kruse, Inc. ("W&K"), appeals from the judgment in favor of Appellees Dick Corporation/Barton Malow, Dick Corporation, and Barton Malow Company (collectively, "DBM") that was entered following a non-jury trial.  W&K was the steel fabricator for construction of the PNC Stadium in Pittsburgh ("the Stadium Project").  Maverick claims that DBM interfered with W&K's contractual relations with W&K's bonding company, United States Fidelity & Guaranty ("USF&G"), causing W&K to suffer financial ruin and bankruptcy.  After a careful review of the record and of Maverick's claims, we affirm.

This is the second time this case has been before us.  See Maverick Steel Co. v. Dick Corp./Barton Malow, 54 A.3d 352 (Pa. Super. 2012),

appeal denied, 65 A.3d 415 (Pa. 2013). We state the facts in a light favorable to DBM, the verdict-winner. See Nicholas v. Hofmann, 158 A.3d 675, 688 (Pa. Super. 2017).

On August 2, 1999, W&K entered into a structural steel subcontract ("the Contract") with DBM to provide steel for the Stadium Project. The Contract required W&K to obtain a performance bond, which USF&G issued to W&K on August 2, 1999 ("the Performance Bond"). Maverick claims that prior to the Stadium Project, W&K had "the highest rating which USF&G gives to its potential contractors." Maverick's Brief at 13 (citing N.T. Trial 644).

W&K was required to provide schedule information to DBM by late August. It faxed that information on September 30, 1999. There also was a delay of the date when W&K began erecting steel. During trial, Jeffrey Klinefelter, a scheduling expert and consultant retained by USF&G, opined that the postponements were caused by delays by the piling contractor in creating the building foundation and by delays and changes to the design documents. N.T. Trial at 1112-13, 1133-34, 1163. However, John Reich, a Barton Malow employee and DBM's project director in charge of daily site operations for the Stadium Project, testified that W&K never provided any scheduling analysis to DBM explaining the reasons for its delays and never submitted any quantification of how many days W&K was allegedly delayed. Id. at 2575-76.

W&K had problems fabricating and delivering steel for the Stadium Project throughout the remainder of 1999 and into 2000. In February 2000, W&K submitted a "recovery" schedule — that is, a modified schedule which accelerated the fabrication and erection process in an attempt to offset the delays that had already occurred. By early March 2000, W&K's problems — particularly its fabrication and delivery delays — became a major concern for DBM's management team. DBM therefore met numerous times with W&K in an effort to assist W&K in resolving its problems, wrote to W&K (without including USF&G) about its concerns, and reminded W&K that "[p]roper notice and justification must be provided to our office for any deviation from the dates in your schedule[.]" DBM's Ex. 214. DBM's Reich later testified: "[W]e brought [W&K] in and had a lot of meetings with them to find out what the issues were and how we could help." N.T. Trial at 2499. George L. Harakal, Dick Corporation's chief operating officer, testified that he arranged the meetings between USF&G and DBM but that the meetings were not productive. Id. at 3285.

On March 3, 2000, DBM faxed W&K a list of the problems that its engineer had observed at W&K's facility. Among other things, DBM complained that it could not "obtain[] reliable information concerning deliveries" and that "pieces" were being fabricated and "delivered out of order" (that is, they were not delivered in accordance with prescribed sequences for fabrication and assembly). DBM's Ex. 41.

DBM was concerned that W&K was failing to adhere to the recovery schedule and unable to manage its work properly and that W&K's problems were negatively impacting the schedule for the entire Stadium Project. See DBM's Exs. 74 & 77. In May 2000, DBM sought a meeting with W&K and USF&G to discuss this issue. A May 17, 2000, letter from DBM to Stephen Cacali, W&K's bonding agent and insurance broker, stated:

> [USF&G] is aware that timely construction of PNC Park has been threatened by delays to [W&K]'s structural steel work. While [W&K] is of the opinion that responsibility for the delay rests with the [Stadium] Project[']s Structural Engineers, please be advised that responsibility for the delay has not been finally determined or apportioned. It is also important to recognize that the financial exposure for late completion of the [Stadium] Project is severe with potential liquidated damages running as high as $6,000,000.00.
>
> . . . [I]t is critical that all efforts be made to mitigate delays so that the [Stadium] Project can be completed consistent with the Contract[']s requirements. To date, [DBM] has been extremely frustrated with [W&K]'s responses to the delay. Our review of the facts indicates that [W&K] may not have the proper procedures in place to manage a contract of this magnitude. Our concern has been heightened by [W&K]'s failure to adhere to its own revised Project schedule . . . .
>
> [DBM] is committed to providing [W&K] with all necessary assistance to ensure the timely and satisfactory performance of its work. To this end, we request a meeting with authorized representatives of USF&G and [W&K] to ensure that both of you are equally committed to taking all the necessary steps to ensure [W&K]'s satisfactory and timely performance of its obligations. The failure to do so will have grave financial consequences for all parties.
>
> Accordingly, upon receipt of this letter, please confirm that authorized representatives of USF&G and [W&K] will attend a jobsite meeting scheduled for May 23, 2000.

DBM's Ex. 76.

At trial, the court asked Anthony Phillips, an USF&G underwriter, to clarify whether USF&G "at least temporarily stopped bonding W&K" after receiving this letter of May 17, 2000. N.T. Trial at 644 (citing DBM's Ex. 76). Phillips answered, "Yes, because it was required by the rules and regulations by USF&G . . . that bonding would have to be temporarily cut off." Id. He continued that, "if it became more serious, like a Notice of Default, then bonding would be permanently cut off." Id.

At the meeting on May 23, 2000, DBM told Phillips that "USF&G as surety possibly need[ed] to step to the table when the funds run out." Maverick's Ex. 229 (e-mail from Phillips, 5/24/00). On May 25, 2000, Cacali wrote a memorandum to Barbara Henry at Kemper Insurance Company, which had extended a conditional surety offer to W&K, stating that "[n]either the Joint Venture [DBM] or Owner were motivated to drive [W&K] out of business." Maverick's Ex. 118 at 2. During trial, Cacali attributed this statement to a Barton Mallow executive, Glenn Little, and explained:

> He says our purpose isn't to drive [W&K] out of business. I mean, we wanted to get this thing back on track. We're all partners. I think it might have been him saying, "We're all partners on this project. Let's get it back on track."

N.T. Trial at 753-54.

On June 2, 2000, DBM sent a letter to Cacali warning that a "financial review of W&K's contract and information provided by W&K indicates that W&K does not, at this time, have sufficient funds available under its contract to satisfy its contractual obligations" and demanding that "USF&G

immediately provide[ DBM], in writing, with adequate assurances that it will advance [W&K] the necessary funding," adding that there would be "serious consequences to the [Stadium] Project and all parties if USF&G and [W&K] fail to honor their contractual obligations." Maverick's Ex. 469. Two days later, on June 6, 2000, DBM wrote to USF&G:

> [DBM] has serious concerns about [W&K]'s ability to perform its contractual obligations in connection with the [Stadium] Project. [W&K] has provided us financial information that indicates that its cost to complete construction exceeds contract funds. Moreover, [W&K] continually fails to deliver steel per the delivery dates it has previously provided to [DBM]. It simply does not appear to [DBM] that [W&K] has, at this time, the necessary resources to complete its contractual obligations. . . . [W]e expect USF&G and [W&K] to provide us with the assurances requested in our June 2, 2000 letter. Once again, we expect USF&G to fund [W&K]'s performance.

Maverick's Ex. 215.

On June 8, 2000, DBM sent W&K a notice of default. Robert Wyatt and Dino Persichetti, DBM project executives for the Stadium Project, sent the following letter on to USF&G and W&K:

> Despite repeated warnings from [DBM], . . . [W&K] has failed and refused to prosecute its work with the necessary diligence to ensure completion of its work within the contract time. . . .
>
> Accordingly, [DBM] is providing both of you with formal notice that [DBM] is terminating [W&K]'s contract for the structural steel for default. The termination will be effective five (5) days from the date of this letter, or June 13, 2000.

Maverick's Ex. 452 ("the Default Notice"). In the letter, DBM sought coverage from USF&G. Id. When asked during trial if he "sign[ed] and sen[t]" the Default Notice "in an effort to try to put [W&K] out of business,"

Persichetti replied, "Absolutely not." N.T. Trial at 2782. Persichetti asserted that there were no conversations "whatsoever" among those participating in the decision to send the Default Notice that the Notice "might cause [W&K] to be forced into bankruptcy." Id. at 2961. He never thought about it and "guess[ed] no one else did," because he did not remember a discussion about it. Id. at 2962. According to Persichetti, DBM issued the Default Notice, because "we were concerned about the performance and getting the project completed, and we weren't getting assurances that schedules were being met." Id. at 2967. Harakal agreed:

> Q. Once it became clear to you that USF&G was not going to support [W&K], did [DBM] then decide to issue the [Default Notice]?
>
> A. We looked at that I think as our only option at that point. If they weren't going to come to the table through a relationship type of arrangement, discussions, own up to their responsibility on their bond, then we'd have no choice but to also follow protocol and do exactly what their bond says, and that's put them on notice that we have an issue, put their customer on notice that we have an issue, that we intend to default if it's not cleared up.
>
> It was, to me, the logical next step and, frankly, the only leverage that we had, and by contract, what we had to do legally. . . .
>
> Q. Was there any discussion among the people at [DBM] that the Default Notice might cause [W&K] difficulty in obtaining future bonding?
>
> A. That wasn't really any of our business. I don't remember ever having that conversation with anybody.

Id. at 3287, 3365.

In June 2000, following the Default Notice, USF&G hired William Chapman, a construction consultant, to investigate whether it should continue to finance W&K or whether it should find another company to complete the steel erection. N.T. Trial at 3438-39, 3492, 3523-24. Chapman explained that, when he reported back to USF&G, he "learned from the conversations that USF&G said if there's a default on the project, they did not want to use [W&K]. They wanted to use an outside source." Id. at 3461. He continued:

[A.]   So the question they asked me was:  "Can we find another fabricator?" . . . I said you can probably find another fabricator, but we do have some issues that need to be thought about before you make a decision.

One, as it turned out, the steel had already been shipped to some different fabricators.  As I understand it, the steel went to Texas, it went to Cleveland, and it went to Canada.  I'm not sure how many different states, but steel had been shipped all over.

So if you bring another contractor in to fabricate the steel, the first thing he's got to do is find out where it is and determine whether he's going to fabricate it or let them fabricate it.

So it's almost like you're going to where the steel is to haul it out from one location to another.

Q.     The fact that the steel was being fabricated all over the place, is that a problem?  Did it present problems?

A.     It would have presented a problem if you had tried to rebid it with another contractor, because that particular contractor-fabricator would need to — he would need to know where the steel was and what was available and start putting everything together.

The real problem is that in my opinion, you would be losing probably six months of time, and that's what I told USF&G; that if they got someone else and they went through all of those

processes, they may lose that much time and they needed to understand that.

Q.     That loss of time would be a significant problem, wouldn't it?

A.     Well, if there are liquidated damages; for example, you have a six-month delay, that's a problem.

Id. at 3461-62.  Based upon Chapman's advice, USF&G decided to continue to fund W&K rather than pay for a replacement steel subcontractor.

On June 12, 2000, on behalf of DBM, Reich wrote what has been referenced in the case as "the Forbearance Letter," a letter to USF&G and W&K with a reference line "PNC Park W&K."  DBM's Ex. 99.  The Forbearance Letter stated:  "Both USF&G and W&K have been on notice for quite some time that W&K has been in breach of its contract as a result of its failure to perform consistent with its contractual obligations" and that "DBM had demanded that USF&G provide adequate assurances that it would ensure W&K's performance by advancing W&K the necessary funds, and taking all other steps to ensure W&K's performance."  Id.  The Forbearance Letter continued:  "USF&G has not yet provided DBM with adequate assurances of W&K's performance even though W&K is still not performing consistent with its contractual obligations"; "DBM has nevertheless decided to exercise a limited forbearance and not terminate W&K at this time in view of certain statements made to DBM by W&K and USF&G . . . regarding W&K's future intentions."  Id.  The Forbearance Letter concluded:  "USF&G has until Tuesday, June 20, 2000 to render satisfactory performance of its obligations

. . . if USF&G does not provide us with the performance required under its bond, USF&G will be in default of its obligations." Id.

Reich later testified that after he wrote the Forbearance Letter, W&K provided "some assurances that caused [him] to believe it would be better for [DBM] to keep [W&K] on the project" than terminating it: "Specifically, I think it was just that we could maintain [W&K's] erection crews and fabrication and all of the fabrication plans, and that they would assist us in managing that process"; "[s]o we jumped in and agreed, okay, we'll do that jointly together and we'll keep you under contract." N.T. Trial at 2533-34. Reich continued that there were "some conversations with USF&G that they were going to step in and provide some funding" and that "the project would be better served at this point in time based on what [he] had heard from [W&K], to keep [W&K] on the project as opposed to terminating their contract." Id. Reich testified that these reassurances were "not just from [W&K], but from USF&G, who was [W&K's] surety." Id. Harakal explained that after "[t]he Default Notice gets issued," DBM "look[ed] at how we're going to finish the job. The decision is made not to default, but to work through the process with [W&K]." Id. at 3389.

Persichetti confirmed that the Forbearance Letter "was written to protect our rights on the [Stadium P]roject." N.T. Trial at 2769. He explained that USF&G "got involved in the project," and DBM "started getting some assurances from both [W&K] and [USF&G] that they were going to step in and . . . complete the project on time." Id.

- 10 -

When asked if he thought that DBM "was trying to put [W&K] out of business in June of 2000," Patrick Carnevale, a W&K employee, answered: "I don't think anybody intended to put anybody out of business." N.T. Trial at 3079. Asked if he "anticipate[d] any type of lawsuit having to do with whether or not [DBM] intended to bankrupt [W&K]," Carnevale answered, "Not at that time, no." Id. at 3080.

Despite DBM's Forbearance Letter, W&K's financial problems deepened. On June 21, 2000, by a letter referencing a "Notice of Defaults and Demand for Payment," National City Bank ("NCB") notified W&K that it was in default on its bank loans. DBM's Ex. 104. James T. Moorehead, the NCB executive who handled the bank's loans to W&K, testified that, as of May 31, 2000, W&K was out of compliance by $2,600,000 on its $5,000,000 line of credit and that NCB considered that to be a material violation of W&K's loan agreements. DBM's Ex. 104; N.T. Trial at 1413. In addition, W&K's financial condition, properties, and business operations had been materially and adversely affected as a result of the disputes between W&K and DBM regarding the Stadium Project, as stated in the Default Notice. DBM's Ex. 104; N.T. Trial at 1391-94. Moorehead said these were the "main reasons" for NCB's notice of default and that he did not believe NCB would have sent the notice if it were not for these two factors. Id. at 1393-94.[1]

---

[1] Moorehead further testified that NCB would have been looking at the following three defaults, even if it had not received a copy of the Default Notice: (1) a revolving credit note dated February 28, 1995, in the original amount of $850,000 executed by W&K; (2) a commercial note dated
(Footnote Continued Next Page)

As a result of the various defaults, W&K became liable for immediate repayment of $15.3 million to NCB., in addition to the $8,500,000 W&K owed to USF&G. DBM'S Exs. 99 & 104; Maverick's Ex. 731; N.T. Trial at 409-13, 423, 427, 552, 1367-68, 1375, 1388-89, 1401-03, 1405, 1413, 1981-82, 1713-17, 2000, 2192-93, 3366-67. W&K's president and its chief financial officer testified at trial that W&K was required to disclose these amounts on its financial statements and thereafter was unable to obtain credit from another bank or bonding company. Id. at 416-17, 419-20, 2000-01.

Between June 23 and July 7, 2000, DBM provided W&K with $1,648,293.15 to fund W&K's various debts related to the completion of the Stadium Project, including payments to W&K's subcontractors and suppliers and for union fringe benefits and salaries. Maverick's Ex. 429. On July 12, 2000, DBM, USF&G, and W&K executed an Interim Funding Agreement ("IFA") to fund W&K's work on the Stadium Project. Maverick's Ex. 429. Under the IFA: DBM "agree[d] to make available funds for the prosecution and completion of the [Stadium Project] by W&K" of $9,400,000.00, in addition to the contributions it had made to W&K in June 2000 and earlier in July 2000, and USF&G agreed to pay $4,700,000.00 towards completion of

(Footnote Continued) ——————————————
November 23, 1998, in the original principal amount of $1,290,000, and (3) a commercial note dated February 8, 1998, in the original amount of $202,482.69. DBM's Ex. 104.

the Stadium Project. Id. at 1, 4 ¶¶ 1-2. DBM agreed to withdraw the Default Notice. Id. at 4 ¶ 11.[2] The IFA also stated, in relevant part:

> 12. Except as expressly amended or modified in this [IFA], all terms and conditions of the Bond remain in full force and effect as written, except to the extent it may have been heretofore discharged, and all parties to this [IFA] expressly reserve all of their rights, defenses, privileges, remedies, and interests pursuant to the terms and conditions of the Bond and pursuant to applicable law. DBM maintains its position that nothing has heretofore discharged the Bond. This [IFA] shall neither constitute not be interpreted as a waiver by or estoppel against any party to assert any such right, defense, privilege, remedy, or interest. . . .

> 14. The terms of [W&K]'s Contract remain in full force and effect. . . .

Id. at 4-5 ¶¶ 12, 14.

Harakal testified that he signed the IFA on behalf of DBM and participated in its negotiation; he stated that, ultimately, DBM's payment to W&K or its vendors was about $16,000,000. N.T. Trial at 3302-03. He

_____

[2] The IFA stated:

> 9. . . . Nothing herein, however, is intended to excuse in any way any claimed W&K performance failures prior to the execution of this [IFA], or diminish DBM's position that it was justified in default/terminating W&K's Contract and seeking to exercise its rights under the Bond. . . .

> 11. DBM withdraws its June 8, 2000 notice of default/termination to W&K; however, DBM does not by doing so waive its claims that W&K has failed to perform consistent with its contractual obligations and it is agreed that withdrawal of that notice is not an admission or an acknowledgement by DBM that the [Default N]otice was not properly issued, or that DBM did not properly trigger USF&G's obligations under the Bond, or that USF&G's obligations have heretofore been discharged.

Maverick's Ex. 429, at 3-4 ¶¶ 9, 11.

asserted that the payments made by DBM were subject to a reservation of rights, that DBM was not admitting that W&K was owed money, and that DBM had paid the vendors of W&K that DBM "believed were necessary to keep the steelwork moving [and] necessary to support the project schedule." Id. at 3304.

Harakal stated that the money DBM contributed under the IFA "came from the contingency account and also from some of our fee[.]" N.T. Trial at 3300. His testimony continued:

> Q.      And did you use some of the fee money that you were paid from the owner to fund [W&K]'s work?
>
> A.      Yes.
>
> Q.      Did you feel that [W&K] was owed that money?
>
> A.      No.  The [Stadium P]roject needed the money . . . to be completed. . . . [T]he contract was $20 million, that's what I felt [W&K] was owed, the $20 million.
>
> If the[re] were changes, legitimate changes on top of that, then the Change Order would have been issued, and he would have gotten more money out of it.  $20 million, and then add 16 to it, and you are $36 million, that's a lot of money.
>
> Q.      Was using both money from [DBM]'s contingency, as well as fee that it was paid by the owner, one of the ways that you felt [DBM] supported [W&K] on the [Stadium Project]?
>
> A.      Yes.

Id. at 3300-01.  Harakal explained the significance of DBM's use of contingency funds as follows:

> Our only access to funds, being [DBM], are the contract funds. We used the contingency money and fee money to fund the

remaining structural steel project, and I have to say it wasn't an easy task.

The [Public Auditorium Authority of Pittsburgh and Allegheny County] did not want us to do that. They were adamant about it. John Lloyd [of Pittsburgh Associates, the Pittsburgh Pirates' construction representative,] said, "Absolutely not. You are not going to use that money for helping a sub that's in trouble. That's not the intent," in their opinion.

We went through a tremendous amount of effort to get them to release that money. We're in the summer, fall of 2000 leading into the completion of the project. They finally do relent.

At no time during that operation, during that discussion that's going on is anybody talking to insurance companies. Nobody is talking to about getting this money replenished.

We're looking at, okay, it's contingency money. We got to get this job done. That's what it is there for. Let's just put it out there. Let's get the job done and see what happens.

So we're out the money without any guarantees, any guarantees of getting paid back. We're talking contingency. The job is not anywhere near completion. We have a long way to go.

Typically that contingency money is used towards the end of the job for acceleration issues, for change issues, for whatever comes up. Whatever unforeseen issue pops up, we reach in that pot and pull it out. Hopefully there's some left at the end of the job.

We're expending that money earlier than we had planned on spending. So we're in a hot seat.

. . . Now, if you get to the end of the job, there's no money left in that pot, the job is not done, it's coming out of our pocket to finish it.

. . . [A]t the time we decide to assist [W&K] to the completion of the job, and go into the [IFA] with USF&G, and put all of that money at risk, we have no clue there's going to be a settlement on this job.

It appears, from what I'm listening here today, that you're trying to wrap that into it and say, [']Well, these guys knew that if they were able to default [W&K], the insurance would cover it, they'd get their money back, there's no risk.[']

Absolutely not. We were at risk for this money, until the time that a check was actually cut to [DBM]. And how that all came down then played out over basically ten months.

N.T. Trial at 3389-93.

By September 2000, W&K had significant accounts receivable and accounts payable, along with major underbillings and borrowings, as demonstrated by its end-of-month balance sheets. DBM's Exs. 116 & 117. On December 26, 2000, W&K restructured its loans and obtained an additional $1,200,000 in credit from NCB. DBM's Ex. 126. As part of the restructuring agreement, W&K agreed either to provide an acceptable repayment plan by June 30, 2001 for a portion of its loans totaling $5,400,000 or to "begin a principal payment of $100,000 per month beginning 6/30/01." Id. By December 31, 2000, W&K had drawn $8,360,000 on its lines of credit from NCB. N.T. Trial at 2118. On January 4, 2001, W&K and NCB executed an Amended and Restated Credit Agreement for seven notes with principal amounts totaling $11,340,147.30. DBM's Exs. 131-139; N.T. Trial 1313.

Despite its financial difficulties, W&K successfully completed the stadium steel erection sometime during this period. N.T. Trial at 3352.[3]

_____

[3] In its brief to this Court, Maverick states that the steel erection was completed on September 8, 2000, Maverick's Brief at 12; however, the citation it provides — N.T. Trial at 3352 — does not give a specific date,
(Footnote Continued Next Page)

Indeed, it did so within 21 weeks — ten weeks less than the 31 weeks originally allowed in the Contract. Id. at 1141-42.

By the fall of 2001, W&K's downward financial spiral led to bankruptcy. On May 1, 2001, NCB debited W&K's account for failing to pay down its revolving credit note. N.T. Trial at 2127-28. According to its end-of-month balance sheet for June 2001, W&K had minimal cash and massive accounts receivable, accounts payable, and borrowings. DBM's Ex. 152. In August 2001, W&K announced a plan to create a new company in its place, DBM's Ex. 158; N.T. Trial at 1528-29, and it assigned its claims for costs and expenses under the Contract to USF&G. DBM's Ex. 157; N.T. Trial at 446. On October 30, 2001, five of W&K's creditors filed a petition under Chapter 7 of the United States Bankruptcy Code for W&K's dissolution. Second Am. Compl., 5/22/03, at 17 ¶ 70.

On November 21, 2001, Maverick was created and purchased W&K's assets. Maverick's Ex. 598. The assets "included all of W&K's remaining rights under" the Contract, Second Am. Compl., 5/22/03, at 17 ¶ 71, along with "W&K's other claims against [DBM] that were not based on" the Contract "and were not assigned to USF&G." Id. at 17-18 ¶ 71. In December 2001, NCB obtained a confessed judgment against W&K in the amount of $11,253,812.06. DBM's Ex. 161.

_____

(Footnote Continued) ————————————
stating only that, "[a]fter the Default Notice, [W&K] actually finished the job." Id. The stadium was eventually completed in 2001.

On May 22, 2002, Maverick filed this lawsuit against DBM, averring breach of contract, fraud, conspiracy, trade libel, and intentional interference with business relationships. Eventually, all of Maverick's claims other than contractual interference were dismissed or withdrawn. The contractual interference claim averred that "DBM falsely asserted that W&K was in default [of its structural steel sub-contract with DBM], knowing that it was not, with the intention of extorting funds from USF&G to cover the extensive cost overruns for the structural steel on the [Stadium P]roject" and that this act made W&K unable to obtain future financing and led to its financial demise. Maverick's Am. Pretrial Statement at 75-76. The trial court denied DBM's pre-trial motions for judgment on the pleadings and summary judgment with regard to Maverick's intentional interference count, and that claim was tried non-jury between November 1 and 8, 2010.

During trial, when asked if he ever "want[ed] to put [W&K] out of business," Reich answered, "No, absolutely not." N.T. Trial at 2598. Persichetti also testified as follows:

> Q.    Now, did you ever direct [W&K]'s vendors or subcontractors, did you ever advise them about [W&K]'s payment bond in an effort to financially hurt [W&K]?
>
> A.    No.  Only to protect our rights.
>
> Q.    Did you ever tell [W&K]'s vendors or subcontractors about [W&K]'s payment bond in an effort to drive [W&K] out of business?
>
> A.    No, that was never the intent.

Id. at 2781-82. Similarly, when Harakal was asked if he "want[ed] to put [W&K] out of business," he answered, "Absolutely not." Id. at 3295.

Harakal also gave the following testimony:

Q. And do you recall [DBM] ever advising the vendors about [W&K]'s payment bond?

A. I don't know if that actually happened. That would be the normal course of events. . . . [T]hat's the way the contracts are set up. If there's a payment bond in place, then that vendor would have to go through the process, go through that subcontract's payment bond.

We actually did have an obligation to supply that information. It's a public job, publicly-bid job.

Q. Did [DBM] ever tell any W&K vendors about a [W&K] payment bond in an effort to try and put financial strain on [W&K]?

A. I would not say that -- to that extent, no, not to purposely put a strain on them, but just the normal course of events, we would say there is a payment bond available that you can go after.

Q. All right. Would you ever advise the vendors about a payment bond to try and put [W&K] out of business?

A. No.

Id. at 3305-06.

David Hussey, USF&G's chief underwriter responsible for the eastern half of the United States during the Stadium Project, testified that he was aware of the Default Notice. N.T. Trial at 3210. His testimony continued:

Q. And if a new client came into USF&G that had been defaulted on a bond issued by another bonding company, wouldn't they be required to report to you, USF&G, that they had been defaulted?

A.  . . . It would certainly be in the best interests that the agent put that on the table.  Not all agents would. . . .

Q.  Isn't there an application the contractor has to fill out in order to get performance bonds?

A.  No.  There's a contractor's questionnaire that is usually filled out at some point.

Q.  Does the contractor's questionnaire ask if the contractor has ever been defaulted?

A.  Yes, it does.

Q.  So if a contractor is truthful when he makes his application, he does have to tell the new bonding company that he had been defaulted.  Is that a fair statement?

A.  That's a fair statement.

Id. at 3211-12.

On February 10, 2011, the trial court entered a directed verdict in favor of DBM on the ground that the gravamen of Maverick's claim was trade libel and the claim therefore was barred by a one-year statute of limitations. Maverick filed a notice of appeal, and, on August 21, 2012, this Court reversed, holding that the action was not grounded in trade libel and that it was timely filed within the applicable two-year statute of limitations;  we remanded for further proceedings.  Maverick, 54 A.3d at 354-58.

On April 8, 2014, the trial court ordered the parties to submit findings of fact and conclusions of law based on the trial record made in 2010. Order, 4/8/14.  The parties complied, and on January 25, 2016, the trial court entered the following verdict:

The evidence introduced at trial . . . failed to convince [the trial court] that:

      a)    [DBM] intended to harm W&K's contractual relationship with [USF&G];

      b)    [DBM] acted in bad faith; or

      c)    [DBM's] conduct caused USF&G to stop bonding W&K or forced W&K into bankruptcy.

Verdict is therefore rendered in favor of [DBM].

Non-Jury Verdict, 1/25/16; see also Trial Ct. Op., 7/27/16, at 3.

Maverick did not file a post-trial motion. Instead, on February 15, 2016, Maverick filed a notice of appeal to this Court. On March 9, 2016, DBM filed a praecipe for judgment, and the entry of judgment then made the trial court's decision appealable. See Pa.R.A.P. 301. We treat Maverick's appeal as having been filed as of that date. See Pa.R.A.P. 905(a)(5).

Maverick presents the following questions for our consideration:

1.    Did [Maverick] prove a prima facie case for intentional interference with contractual relationships?

2.    Did the [trial c]ourt commit an error of law in holding that an actual intent to harm was a required element for the tort of intentional interference with contractual relationships?

3.    Did the [trial c]ourt commit an error of law in holding that bad faith was a required element for the tort of intentional interference with contractual relationships?

4.    Did the [trial c]ourt employ an incorrect legal standard in its analysis of the causation issue?

5.    Were the [trial c]ourt's findings that DBM's conduct did not result in an interference with W&K's relationship with its bonding company or cause W&K to go out of business contrary to the overwhelming and manifest weight of the evidence?

Maverick's Brief at 4 (answers omitted).

Our standard of review follows:

Our appellate role in cases arising from non-jury trial verdicts is to determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law. The findings of fact of the trial judge must be given the same weight and effect on appeal as the verdict of a jury. We consider the evidence in a light most favorable to the verdict winner. We will reverse the trial court only if its findings of fact are not supported by competent evidence in the record or if its findings are premised on an error of law. However, where the issue concerns a question of law, our scope of review is plenary.

The trial court's conclusions of law on appeal originating from a non-jury trial are not binding on an appellate court because it is the appellate court's duty to determine if the trial court correctly applied the law to the facts of the case.

Bank of N.Y. Mellon v. Bach, 159 A.3d 16, 19 (Pa. Super.) (citation omitted), appeal denied, 170 A.3d 1019 (Pa. 2017).

In our earlier decision in this case, we explained:

Tortious interference with prospective or existing contractual relations consists of the following elements:

(1) the existence of a contractual, or prospective contractual relation between the complainant and a third party;

(2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring;

(3) the absence of privilege or justification on the part of the defendant; and

(4) the occasioning of actual legal damage as a result of the defendant's conduct.

- 22 -

> In determining whether a particular course of conduct is improper for purposes of setting forth a cause of action for intentional interference with contractual relationships, or, for that matter, potential contractual relationships, the court must look to section 767 of the Restatement (Second) of Torts. This section provides the following factors for consideration: 1) the nature of the actor's conduct; 2) the actor's motive; 3) the interests of the other with which the actor's conduct interferes; 4) the interests sought to be advanced by the actor; 5) the proximity or remoteness of the actor's conduct to interference, and 6) the relationship between the parties.

Maverick, 54 A.3d at 354–55 (citation omitted).[4]

Maverick's issues require us to determine whether the trial court erred in concluding that Maverick failed to prove the elements of this claim. Because the first element — existence of a contractual relation between W&K and its surety, USF&G — is undisputed, Maverick's Brief at 26; DBM's Brief at 25; Second Am. Compl., 5/22/03, at ¶ 124; Maverick, 54 A.3d at 353, our analysis focuses on the remaining elements. Because we conclude that the second and third elements of the tort are dispositive here, we do not reach Maverick's questions relating to whether DBM's conduct actually caused an impairment of W&K's relationship with USF&G or caused W&K's damages.

---

[4] The trial court's opinion correctly identified these four elements and the six factors to consider when determining whether conduct is improper under Section 767 of the Second Restatement of Torts; it then adopted DBM's Proposed Findings of Fact, 5/12/14, at 1-253, 255-398, 423-515 and Proposed Conclusions of Law, 5/12/14, for the second through fourth elements of tortious interference. Trial Ct. Op., 7/27/16, at 2-3 (citing Maverick, 54 A.2d at 353, 355). The trial court's opinion made no additional findings and provided no other analysis. See generally id.

### Purposeful Action Specifically Intended to Harm

The trial court's decision stated that Maverick failed to prove that DBM "intended to harm W&K's contractual relationship with" USF&G. Non-Jury Verdict, 1/25/16. Maverick contends that the trial court erred because "[a]ctual intent to interfere is not required" to prove tortious interference, and the trial court misapplied controlling law in holding otherwise. Maverick's Brief at 39. Maverick continues:

> [T]he law is clear that the plaintiff need not establish actual intent. Rather, it is sufficient that the actor has reason to know that his actions will result in interference. The Restatement 2d of Torts, Section 766 is directly on point. As stated in Comment j:
>
> > It (the rule) applies also to intentional interference, as that term is defined in Section 8A, in which the actor does not act for the purpose of interfering with the contract or desire it, but knows that the interference is certain or substantially certain to occur as a result of his action.
>
> . . . Since [the trial court] failed to recognize or apply this controlling legal precept, [its] decision is legally erroneous and must be reversed.

Maverick's Brief at 39, 42 (emphasis in original). Maverick also contends that even if specific intent were required, the evidence established "specific[] inten[t] to harm the existing relation" with USF&G. Id. at 26.

DBM maintains that the trial court "correctly required Maverick to establish that DBM specifically intended to harm W&K and properly held that Maverick failed to do so." DBM's Brief at 53. DBM argues:

> [The trial court] did not require Maverick to prove actual intent. Instead, while [the trial court] held that the evidence had not

convinced [it] that "DBM had intended to harm W&K's relation with USF&G" in [its] Order, [it] issued an Opinion (a) citing the interference claim's four elements from the Prior Opinion and (b) adopting (in pertinent part) DBM's legal argument acknowledging that Maverick could have satisfied the claim's second element by introducing evidence establishing that DBM knew that the Default Notice was certain or substantially certain to interfere with that relationship but failed to introduce any such evidence. [Trial Ct. Op., 7/27/16, at 2.]

Id.

As we observed in our first opinion in this case, we look to Section 767 of the Second Restatement of Torts when assessing a tortious interference claim. Maverick, 54 A.3d at 355. Comment d to Section 767 states:

Since interference with contractual relations is an intentional tort, it is required that in any action based upon §§ 766 [intentional interference with performance of contract by third person], 766A [intentional interference with another's performance of his own contract] or 766B [intentional interference with prospective contractual relation] the injured party must show that the interference with his contractual relations was either desired by the actor or known by him to be a substantially certain result of his conduct.

Id. (emphasis added). Thus, Maverick did not have to establish that DBM acted for the sole purpose of interfering with its contract with USF&G. It needed to establish only that DBM knew or should have known that such interference would actually occur or had a substantial certainty of occurring — specifically, that DBM was aware that improperly declaring a default on this Project would impair W&K's contractual relationship with USF&G and lead to significant financial harm to the company.

The competent evidence of record supports the trial court's finding that Maverick failed to meet this burden. Even applying the definition of

intent set forth in the Restatement, Maverick did not establish that DBM intended to harm W&K or to prevent it from obtaining bonds from USF&G on projects other than the Stadium Project.

Harakal testified that he "absolutely" did not want to put W&K out of business. N.T. Trial at 3295. He also testified that, when DBM informed W&K's vendors about the Performance Bond, it was "not to purposely put a [financial] strain on [W&K]" or to "put [W&K] out of business." Id. at 3305-06.

Persichetti testified that he did not advise W&K's vendors or subcontractors about W&K's payment bond in an effort to financially hurt W&K or to drive W&K out of business. N.T. Trial at 2781-82. When asked if he "sign[ed] and sen[t]" the Default Notice "in an effort to try to put [W&K] out of business," he replied, "Absolutely not." Id. at 2782. Persichetti further asserted that there were no conversations "whatsoever" among those who participated in the decision to send the Default Notice about whether it "might cause [W&K] to be forced into bankruptcy." Id. at 2961. He never thought about that question and "guess[ed] no one else did," because he did not remember a discussion about it. Id. at 2962.

When Reich was asked if he "want[ed] to put [W&K] out of business," he answered, "No, absolutely not." N.T. Trial at 2598.

As the trier of fact, the trial court was free to believe these denials. The credibility of witnesses is for the trial court, and we will not second-guess its credibility determinations. Stamerro v. Stamerro, 889 A.2d

1251, 1257–58, 1261 (Pa. Super. 2005); Commonwealth v. A.W. Robl Transp., 747 A.2d 400, 403 (Pa. Super.), appeal denied, 764 A.2d 1063 (Pa. 2000).

Moreover, the record shows that W&K's own people also did not discern any intent to harm W&K's existing relationships. Carnevale testified that he "[did]n't think anybody intended to put anybody out of business," and he did not "anticipate any type of lawsuit having to do with whether or not [DBM] intended to bankrupt [W&K] . . . at that time." N.T. Trial at 3079-80. When explaining a memorandum in which he wrote, "Neither the Joint Venture [DBM] or Owner were motivated to drive [W&K] out of business," Maverick's Ex. 118, Cacali specifically testified that Little said in May 2000 that DBM's "purpose isn't to drive [W&K] out of business." N.T. Trial at 753-54.

Throughout its brief to this Court, Maverick makes sweeping and unsupported assertions about how DBM's actions prove an unlawful intent, but we find those assertions unpersuasive. See Maverick's Brief at 26-30. According to Maverick, DBM's specific intent to harm "began with the issuance of" the May 17, 2000, letter from DBM to Cacali. Id. (citing DBM's Ex. 76), which made claims about "serious problems with [W&K]'s performance" that Maverick insists were false. Id. (citing DBM's Ex. 76). Maverick then cites the following additional "intentional actions": (1) DBM's June 2, 2000 letter to Cacali about W&K's performance problems and contractual obligations; (2) DBM's June 6, 2000, letter to USF&G reiterating

its "serious concerns" about W&K's performance; (3) DBM's June 8, 2000 "wrongful" Default Notice; and (4) the July 12, 2000 "forced" entry by USF&G and W&K into the IFA. Maverick's Brief at 28-30 (citing Maverick's Exs. 469, 215, 452 & 429, respectively). Maverick contends: "[A]lthough DBM's primary intent was to extort money from [W&K]'s bonding company to subsidize the costs of the structural steel cost overruns, DBM had to be aware (and had to be substantially certain) that its actions would result in interference with the contractual relationship between [W&K] and USF&G." Maverick's Brief at 40 (emphasis in original).

We disagree. The evidence of record established that DBM had months of dialogue with W&K about its performance problems before notifying USF&G about them in May 2000 and then meeting with W&K and USF&G later that month. As early as August 30, 1999, DBM wrote to W&K about W&K's failure to provide a contractually-required supply schedule that reflected the timeline DBM wished to achieve. DBM's Exs. 27 & 28. On March 3, 2000, DBM faxed W&K a list of the problems that its engineer had observed at W&K's facility, including that "[t]he greatest problem at [W&K's] site is obtaining reliable information concerning deliveries" and that "pieces" are fabricated and "delivered out of order," including "individual sequences within a sequence." DBM's Ex. 41. On June 2, 2000, DBM wrote to Cacali about DBM's concerns that W&K would not be able to satisfy its contractual obligations. Maverick's Ex. 469. Reich testified that DBM "brought W&K in

and had a lot of meetings with them to find out what the issues were and how we could help." N.T. Trial at 2499.

The evidence also established that in taking these actions, DBM invoked its express rights under the Contract and the Performance Bond after W&K's problems and delays jeopardized the timely completion of PNC Park and exposed DBM, W&K, and USF&G to significant liquidated damages. See DBM's Ex. 76; N.T. Trial at 3461-62. Harakal testified that DBM issued the Default Notice because it was "exactly what their bond says and [that] put them on notice that we have an issue" and was, "by contract, what we had to do legally." Id. at 3287. He further testified that he did not recall any discussions among DBM's representatives that the Default Notice might cause W&K difficulty in obtaining future bonding. Id. at 3365. Persichetti confirmed that DBM issued the Default Notice because "we were concerned about the performance and getting the project completed, and we weren't getting assurances that schedules were being met." Id. at 2967.

Finally, Maverick's brief highlights two pieces of evidence[5] that, it contends, "make it obvious that DBM was 'substantially certain' that its

_____

[5] In its brief, Maverick actually cites to four pieces of evidence. Maverick's Brief at 40-42. However, two of these items were inadmissible and cannot be considered here. One is a deposition given by John Lloyd of Pittsburgh Associates on February 5, 2004, in another lawsuit, U.S. Fid. & Guar. Co. v. Dick Corp./Barton Malow (W.D. Pa. Dkt. Nos. 2001-0698 and 2001-1638); because neither that transcript nor a cited exhibit from it were admitted into evidence in this action, we disregard them. The other is testimony by Harakal about a letter that was marked but not admitted as Maverick's Ex. 193, but the trial court struck that testimony as hearsay, N.T.
(Footnote Continued Next Page)

wrongful acts would result in both an interference as well as substantial economic harm to" W&K. Maverick's Brief at 41-42. First, Maverick states: "David Hussey, the Regional Manager for USF&G, testified that a default on a project this size would prevent a contractor from getting further bonds in the future [N.T. Trial at 3120-12]." Maverick's Brief at 41. But Hussey was from USF&G, and there is no evidence that he discussed this view with DBM. The other fact emphasized by Maverick is that "Dick Corporation, itself, had been involved in a similar case where its wrongful actions caused Dick's subcontractor to be unable to obtain future bonding." Id. (citing Allied Fire & Safety Equip. Co. v. Dick Enters., Inc., 972 F. Supp. 922 (E.D. Pa. 1997)). But there was no testimony at trial that anyone from DBM involved in the Stadium Project knew about the Allied case. Thus, neither of these pieces of evidence undermines the trial court's finding regarding DBM's lack of intent.

Consequently, we hold that the finding of the trial court that there was no action on DBM's part specifically intended to harm the existing relationship between W&K and USF&G is supported by competent evidence.

Justification for DBM's Conduct

The third requirement of tortious interference is an absence of privilege or justification on the part of the defendant. Maverick contends that the trial court failed to make an appropriate finding regarding this

(Footnote Continued) ———————————
Trial at 3359-61, 3364-65, and Maverick does not challenge the propriety of that evidentiary ruling on appeal.

element because, rather than stating whether DBM's conduct was privileged or justified, the court's January 25, 2016 verdict stated, "The evidence introduced at trial . . . failed to convince [the trial court] that . . . [DBM] acted in bad faith." Non-Jury Verdict, 1/25/16. Maverick points out that bad faith "is not a required element of interference." Maverick's Brief at 42.

DBM contends that Maverick may not obtain relief on this issue because Maverick did not raise it in a post-trial motion. DBM's Brief at 56. We disagree. Following the receipt of evidence and consideration of Maverick's post-trial motion in 2011, the trial court entered a directed verdict for DBM on statute of limitations grounds. In 2012, we reversed that directed verdict and remanded for further proceedings. Maverick, 54 A.3d at 354-58. The trial court then entered its January 25, 2016 non-jury verdict containing the language about "bad faith," and Maverick appealed without filing a second post-trial motion. Rule 227.1(i) of the Rules of Civil Procedure provides:

> When an appellate court has remanded a case for further proceedings, a motion for post-trial relief relating to subsequent rulings in the trial court shall not be required unless
>
> > (1) the appellate court has specified that the remand is for a complete or partial new trial, or
> >
> > (2) the trial court indicates in its order resolving the remand issues that a motion for post-trial relief is required pursuant to this rule.

Our remand did not call for "a complete or partial new trial," and the trial court on remand did not require Maverick to file a new post-trial motion.

Therefore, Maverick was not required to file another post-trial motion after the remand and Maverick is free to raise the "bad faith" issue now.

Our review of the record discloses, however, that, although the non-jury verdict included only the court's cryptic reference to a failure to prove bad faith, the court's decision was broader and made a proper evaluation of whether DBM's conduct was privileged or justified. In its opinion dated July 28, 2016, the trial court "adopt[ed] sections III.A., III.B. and III.C. of [DBM's] Proposed Conclusions of Law" filed May 12, 2014. Trial Ct. Op., 7/27/16, at 3 & n.3. Section III.B. of DBM's proposed conclusions of law states that Maverick "failed to establish the absence of privilege or justification on the part of DBM." DBM's Post-Trial Brief, 5/12/14, at 225-39. By adopting this section, the trial court clarified that it did find that Maverick failed to prove the third element of tortious interference with contractual relations and that its finding was not limited to a finding of a lack of bad faith. Thus, any claim by Maverick that the trial court did not properly make findings regarding all of the elements of tortious interference with contractual relations is incorrect and merits no relief.

Maverick also argues that the trial court erred in finding that it failed to prove that DBM acted without privilege or justification. See Maverick's Brief at 31 ("DBM had absolutely no justification for its bad faith course of conduct"). Maverick claims that DBM's default notice was unjustified because "the overwhelming weight of the evidence presented at trial demonstrated that the delays to [W&K]'s structural steel work were caused

by factors beyond its control." Id. In support of this assertion, Maverick relies in part on expert testimony by Klinefelter that "the delay in the piling work resulted in a ten week delay to [W&K]'s structural steel work." Id. at 31-32 (citations omitted). Maverick continues:

> Extensive owner design changes took place throughout the [Stadium] Project. A total of 470 design changes were experienced by [W&K.] . . . This resulted in the re-fabrication of a substantial amount of steel already fabricated by [W&K].
>
> All of the delays . . . completely destroyed [W&K]'s original plan given to DBM which was to subcontract the preponderance of the fabrications to three major fabricators and assemble the steel in large subassemblies at [W&K]'s . . . facility. . . . Th[e delays] substantially increased the labor and cost of the project.

Id. at 33-34 (citations to the record omitted).

> DBM responds:
>
> [T]his Court has held that the Restatement (Second) of Torts §767 makes it clear that "conduct should be permitted without liability, despite its effect of harm to another" in certain circumstances and a court's decision on whether conduct was improper "depends upon a judgment and choice of values in each situation." Walnut Street Assocs., Inc. v. Brokerage Concepts, Inc., 982 A.2d 94 98, 99 (2009) citing Restatement (Second) of Torts §772 cmt. B (1979); see e.g., Chicarella v. Passannt, 494 A.2d 1109 (Pa. Super. 1985) (investigator's report to insurance company was conditionally privileged).
>
> [The trial court]'s Findings of Fact and the prior legal arguments here establish that DBM issued the Default Notice with a privilege and justification under the Contract and Performance Bond and did so in good faith under Restatement (Second) of Torts §767. . . . First, DBM did not terminate W&K for default and instead issued a forbearance letter days after the Default Notice based on assurances from W&K and USF&G. [DBM's Ex. 99 (the Forbearance Letter); N.T. Trial at 2533-34, 2769.] Second, Maverick introduced no evidence that USF&G considered the Default Notice to lack justification. [Id.] Third, W&K finished the Contract only because DBM and USF&G paid W&K or

its subcontractors/suppliers approximately $16 million under the IFA to overcome W&K's performance problems and corresponding delays and DBM helped W&[K] finish its work. [Id.] Finally, DBM withdrew the Default Notice in the IFA slightly more than a month later. [Id.]

DBM's Brief at 31-33. DBM thus asserts that Maverick "failed to establish the absence of privilege or justification on DBM's part." Id. at 30.

We concur with DBM that the evidence supports the trial court's finding that Maverick failed to establish an absence of justification on the part of DBM. A review of the record reveals that, although the Stadium Project did experience 470 design changes, the design changes did not all involve steel or impact W&K. N.T. Trial at 1133-34. Maverick fails to cite evidence that these changes "completely destroyed" W&K's original plan, even if they had some delaying effect. See Maverick's Brief at 34. Moreover, DBM informed W&K that it was willing to "modify" the original schedule if W&K would submit a new suggested timeline and inform DBM of the reasons for its delays – both of which W&K failed to do despite DBM's prompting. See DBM's Ex. 27 (dated 8/30/99; "the original bid package schedule can be modified with your input"); N.T. Trial at 2575-76 (Reich's testimony that W&K never provided DBM with any analysis as to the reasons for its delays and never quantified how many days it was delayed).

As DBM points out, it did not terminate W&K for default. DBM's Ex. 99 (Forbearance Letter stating, "DBM has nevertheless decided to exercise a limited forbearance and not terminate W&K"). Reich testified that W&K and USF&G provided some assurances that made him believe that the "project

would be better served" by keeping W&K rather than terminating it. N.T. Trial at 2533-34. Similarly, Persichetti testified that DBM did not terminate W&K because DBM "started getting some assurances from both [W&K] and [USF&G] that they were going to step in and . . . complete the project on time." Id. at 2769.

Chapman's testimony demonstrated that, contrary to Maverick's contention, the reason W&K finished the Contract following the Default Notice was not that USF&G believed that DBM had issued the Default Notice without a basis or in bad faith. Rather, USF&G was concerned that it would be liable for the delays and accompanying liquidated damages that would result from replacing W&K with a new contractor at that juncture of the Stadium Project. USF&G made this decision after an investigation in which it hired Chapman to determine whether it should finance W&K or hire another contractor to finish the contract. N.T. Trial at 3438-39, 3461-62, 3492, 3523-24.

In the end, W&K was able to finish its steel production obligations only after receiving financial aid from DBM and USF&G. Harakal testified that DBM's used its "contingency account" as the source of that aid and that DBM took significant risk in doing so. N.T. Trial at 3300-01, 3389-93.

For all these reasons, we hold that the trial court's finding that Maverick failed to establish the absence of privilege or justification on DBM's part is supported by competent evidence and that the trial court did not

commit an error in any application of the law.  See Bank of N.Y., 159 A.3d at 19; Maverick, 54 A.3d at 355.

As Maverick failed to establish both the second and third elements of tortious interference, its entire claim fails.  We therefore affirm the trial court's judgment in favor of DBM.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 12/27/2017